John M. Peebles (Cal. Bar No. 237582)
Patrick R. Bergin (Cal. Bar No. 269672)
Michael A. Robinson (Cal. Bar No. 214666)
Tim Hennessy (Cal. Bar No. 233595)
Steven J. Bloxham (Cal. Bar No. 96384)
Curtis Vandermolen (Cal. Bar No. 338366)
PEEBLES KIDDER BERGIN & ROBINSON LLP
2020 L Street, Suite 250
Sacramento, California 95811
Telephone:  (916) 441-2700
Fax:  (916) 441-2067
Email:  jpeebles@ndnlaw.com

*Attorneys for Plaintiff*
ALTURAS INDIAN RANCHERIA

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALTURAS INDIAN RANCHERIA, a federally recognized Indian tribe, | Case No.: |
| Plaintiff, | **COMPLAINT** |
| vs. | |
| GAVIN NEWSOM, Governor of the State of California; and the STATE OF CALIFORNIA, | |
| Defendant. | |

Comes now Plaintiff ALTURAS INDIAN RANCHERIA (the "Tribe" or "Alturas"), a federally recognized Indian tribe, by and through its undersigned counsel, and complains of the Defendants, GAVIN NEWSOM and the STATE OF CALIFORNIA (collectively "the State") as follows:

## JURISDICTION

1.     This action arises out of the State's failure to conduct negotiations with Alturas in good faith for the purpose of entering into a Tribal-State compact in violation of the Indian Gaming

Regulatory Act ("IGRA"), Pub. L. 100-497 (Oct. 17, 1988), 102 Stat. 2467-88, codified as amended at 25 U.S.C. §§ 2701-2721 and 18 U.S.C. §§ 1166-1168, as hereinafter more fully appears.

2.    This Court has original jurisdiction over the subject matter of this action pursuant to: (a) 28 U.S.C. § 1331 (federal question action), in that this is a civil action arising under the Constitution, laws or treaties of the United States; (b) 28 U.S.C. § 1362 (federal question action brought by an Indian tribe), in that this is a civil action brought by an Indian tribe with a governing body duly recognized by the Secretary of the Interior ("Secretary") and the matter in controversy arises under the Constitution, laws or treaties of the United States; and (c) 25 U.S.C. § 2710(d)(7)(A)(i) (state's failure to negotiate in good faith under IGRA), in that this is an action initiated by an Indian tribe arising from the failure of a state to enter into negotiations with the Indian tribe for the purpose of entering into a Tribal-State compact under IGRA or to conduct such negotiations in good faith.

3.    This action arises under the Constitution and laws of the United States, as hereinafter more fully appears, including but not limited to: the Commerce Clause, U.S. Const. Art. 1, § 8, cl. 3; the Supremacy Clause, U.S. Const. Art. VI, cl. 2; IGRA, 25 U.S.C. §§ 2701-2721; the Declaratory Judgments Act, 28 U.S.C. §§ 2201-2202; the All Writs Act, 28 U.S.C. § 1651; and the federal common law.

4.    This Court has supplemental jurisdiction over all other claims that are so related to claims in which this Court has original jurisdiction that they form part of the same case or controversy pursuant to 28 U.S.C. § 1367(a).

5.    This action further arises under the laws of the State of California, as hereinafter more fully appears, including but not limited to: Cal. Const. Art. IV, Sec. 19; Cal. Gov't Code §§ 98005 and 12012.25; and State common law.

6.    The State has waived its sovereign immunity from suit in this action, in that it has waived such immunity in the federal courts with respect to any action brought against the State by a federally recognized Indian tribe asserting any cause of action arising from the State's refusal to enter into negotiations with that tribe for the purpose of entering into or amending a Tribal-State

compact pursuant to IGRA or to conduct those negotiations in good faith.  Cal. Gov't Code § 98005.

7.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 84 and 1391(b)(1) and (2), as each of the defendants herein reside in the Eastern District of California, and a substantial part of the events or omissions giving rise to the claims herein occurred in this judicial district.

## PARTIES

8.      Plaintiff ALTURAS INDIAN RANCHERIA is a federally recognized Indian tribe, *see* Indian Entities Recognized..., 87 Fed. Reg. 4636, 4637 (Jan. 28, 2022) (listing Alturas as "Alturas Indian Rancheria, California"), with principal offices on the Alturas Indian Rancheria, 901 County Rd. 56, Alturas, Modoc County, California.  Alturas is organized under a written Constitution which designates the Alturas General Council as the governing body of Alturas.  The Alturas General Council elects from among its members a three-member Business Committee, which possesses authority to represent Alturas in negotiations with the State, among other things.  Alturas is recognized by the Secretary of the Interior ("Secretary") for the special programs and services provided by the United States to Indians because of their status as Indians and is recognized as possessing the power of self-government.  87 Fed. Reg. at 4637.

9.      Defendant GAVIN NEWSOM is the duly elected Governor of the State of California, with principal offices at 1021 O Street, Suite 9000, Sacramento, CA 95814.  The Governor is authorized to negotiate and conclude Tribal-State compacts, subject to ratification by the Legislature, for the operation of slot machines and for the conduct of lottery games and banking and percentage card games, by federally recognized Indian tribes on Indian lands in California in accordance with IGRA.  Cal. Const. Art. IV, § 19(f).  Gavin Newsom is sued herein in his official capacity.

10.      Defendant the STATE OF CALIFORNIA is a state of the United States of America.

## INTRODUCTION

11.      The State has violated IGRA by failing to negotiate with Alturas in good faith to enter into a Tribal-State compact governing the conduct of class III gaming activities on the Indian lands within Alturas's jurisdiction.  The State has attempted to impose Tribal-State compact

provisions on Alturas that violate IGRA, either or both because such provisions are not directly related to the operation of gaming activities and because they constitute prohibited taxes, fees, charges, or other assessments without an offer of meaningful concessions as consideration.  These provisions are referred to herein as "Unlawful Compact Provisions."  Many of the Unlawful Compact Provisions were declared to be unlawful by the Secretary, the Ninth Circuit Court of Appeals, or both.  Alturas has requested to negotiate these Unlawful Compact Provisions to bring them into compliance with IGRA, but the State has refused to negotiate, or failed to negotiate in good faith.

12.    The Secretary has not affirmatively approved a Tribal-State compact from California since 2004, with only three exceptions – a unique 2013 Tribal-State compact in which the Indian tribe agreed to forgo all class III gaming activities on its Indian lands and, in 2016, partial amendments to two Tribal-State compacts the Secretary had not affirmatively approved.

13.    Since 2004, the Secretary has found more than sixty California Tribal-State compacts and compact amendments unsuitable for affirmative approval because they contain Unlawful Compact Provisions that violate IGRA.  The Secretary has repeatedly warned the State that it must narrowly interpret the State's overbroad Tribal-State compact provisions, or read such provisions out entirely, in order for the compacts to take effect consistent with IGRA.  The State has sought to impose the same unapproved Tribal-State compact provisions on Alturas.  Finally, in November 2021 and July 2022, the Secretary disapproved five California Tribal-State compacts because, inter alia, they included the Unlawful Compact Provisions.  The Ninth Circuit confirmed the Secretary's reasoning for disapproving the Unlawful Compact Provisions, stating: "when a state has demanded that a tribe negotiate on topics well outside IGRA's scope it follows that the state has not negotiated in good faith, end of story."  *Chicken Ranch Rancheria of Me-Wuk Indians v. California*, No. 21-15751, 2022 WL 2978615, *13 (9th Cir. July 28, 2022).  Ignoring the Secretary, the State has continued to attempt to impose the same disapproved Unlawful Compact Provisions on Alturas.  When Alturas asked the State to alter or eliminate the Unlawful Compact Provisions in order to comply with IGRA, the State refused.

14.     The State has also failed to negotiate in good faith by the Governor's refusal, in violation of California Government Code § 12012.25, to negotiate and submit to the State Legislature a Tribal-State compact with Alturas that is materially identical to the Model Compact negotiated, executed and ratified in 1999.

15.     Alturas seeks an order pursuant to 25 U.S.C. § 2710(d)(7)(B) directing the State to conclude a Tribal-State compact with Alturas that complies with IGRA within 60 days.

**GENERAL ALLEGATIONS**

**I.     Alturas Indian Rancheria.**

16.     On July 22, 1924, the United States acquired a 20-acre parcel of land near Alturas, California, using funds allocated by Congress to purchase lands for the use and occupancy of homeless Indians in California. *See* Act of January 24, 1923, ch. 42, 42 Stat. 1174, 1188. This parcel became known as the Alturas Indian Rancheria.

17.     On June 8, 1935, pursuant to section 18 of the Indian Reorganization Act of June 18, 1934 ("IRA"), 48 Stat. 984, 988, codified at 25 U.S.C. § 5125 (formerly codified at 25 U.S.C. § 478), a majority of the adult Indians on the Alturas Indian Rancheria voted in favor of the application of the IRA to the Alturas Indian Rancheria.

18.     In 1972, the people of the Alturas Indian Rancheria adopted the Constitution and Bylaws of the Alturas Indian Rancheria, pursuant to section 16 of the IRA, codified as amended at 25 U.S.C. § 5123 (formerly codified at 25 U.S.C. § 476). Article II of the Tribe's 1972 Constitution stated that the "jurisdiction of the Alturas Indian Rancheria shall extend to all lands now or hereafter comprising the Alturas Indian Rancheria." The Secretary approved this document on May 30, 1972.

19.     On September 9, 1999, the Office of the Solicitor in the Department of the Interior issued a memorandum which concluded, based on the 1923 appropriation, 1924 trust deed, and 1972 Constitution, together with "the fact that the Alturas tribe exercises tribal governmental power over the [Alturas Indian] Rancheria," that "the lands recognized as the Alturas [Indian] Rancheria are Indian lands as defined under IGRA."

20.     In 2005, pursuant to section 16 of the IRA, Alturas adopted a Constitution which stated that it "shall supersede" the Tribe's 1972 Constitution and Bylaws.  Article II of the 2005 Constitution of Alturas Indian Rancheria provides: "The jurisdiction of the Alturas Indian Rancheria shall extend to all lands, water, and resources now or hereafter comprising the Alturas Indian Rancheria, and to any and all lands, water and resources held by the Alturas Indian Rancheria, and to such other additional lands, water and resources acquired by the Alturas Indian Rancheria or by the United States for the benefit of the Alturas Indian Rancheria."  The Secretary approved this document on June 7, 2005.

21.     The Alturas Indian Rancheria is Alturas's Indian reservation within the meaning of IGRA, and as such, it constitutes Indian lands within Alturas's jurisdiction, eligible under IGRA for the operation of class III gaming by Alturas.

## II.     The Indian Gaming Regulatory Act.
### A.     General Provisions.

22.     Before the adoption of IGRA, states had no civil regulatory authority over tribal gaming activities in Indian country.  *See California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987).  IGRA, however, allowed states to play a role in the regulation of "Las Vegas-style" gaming through the good faith negotiation of Tribal-State compacts with Indian tribes, but strictly limited state authority to seven permissible subjects of negotiation.  IGRA also set forth standards to preserve tribal control over gaming activities, including an express declaration of IGRA's purposes; a structure that allocates jurisdiction among the federal government, Indian tribes, and the states; a strict limitation on states' authority to tax tribal gaming activities; and the obligation imposed on states to negotiate Tribal-State compacts in good faith.  State demands to address prohibited topics in a Tribal-State compact or otherwise contravene IGRA's purposes constitute a failure to negotiate in good faith in violation of IGRA.

23.     Congress, when adopting IGRA, found in part that numerous Indian tribes were engaged in or had licensed gaming activities on Indian lands as a means of generating tribal governmental revenue and that a principal goal of federal Indian policy is to promote tribal

economic development, tribal self-sufficiency, and strong tribal government.    25 U.S.C. §§ 2701(1) & (4).

24.    The purpose of IGRA was to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency and strong tribal government, to provide a statutory basis for the regulation of gaming by an Indian tribe adequate to shield it from organized crime and other corrupting influences, to ensure that the Indian tribe is the primary beneficiary of the gaming operation, and to assure that gaming is conducted fairly and honestly by both the operator and players.  25 U.S.C. §§ 2702(1) & (2).

25.    IGRA established independent federal regulatory authority for gaming on Indian lands, established federal standards for gaming on Indian lands, and established the National Indian Gaming Commission ("NIGC") to meet congressional concerns regarding gaming and to protect such gaming as a means of generating tribal revenue.  25 U.S.C. § 2702(3).

26.    IGRA divided gaming into three classes.  Class I gaming consists of social games solely for prizes of minimal value or traditional forms of Indian gaming engaged in by individuals as part of, or in connection with, tribal ceremonies or celebrations.  25 U.S.C. § 2703(6).  Class II gaming consists of bingo (regardless of whether electronic, computer, or other technological games are used in connection therewith) including (if played at the same location) pull tabs, lotto, punchboards, tip jars, instant bingo, and other games similar to bingo, and non-banked card games that are explicitly authorized by the laws of the State or are not explicitly prohibited by the laws of the State and are played at any location in the State.  25 U.S.C. § 2703(7)(A).  Class III gaming is defined as all forms of gaming that are not class I gaming or class II gaming.  25 U.S.C. § 2703(8).

27.    IGRA authorizes class III gaming on Indian lands only if the class III gaming activities are authorized by a tribal ordinance or resolution, located in a state that permits such gaming for any purpose by any person, organization, or entity, and conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the state.  25 U.S.C. § 2710(d)(1).

28.    IGRA defines Indian lands as all lands within the limits of any Indian reservation; and any lands title to which is either held in trust by the United States for the benefit of any Indian

tribe or individual or held by an Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power.  25 U.S.C. § 2703(4).

29.   IGRA requires an Indian tribe proposing to engage in, or to authorize any person or entity to engage in, class III gaming activity on Indian lands of the Indian tribe, to adopt and submit to the Chairman of the NIGC an ordinance or resolution that meets the requirements of IGRA. 25 U.S.C. § 2710(d)(2)(A).  The Chairman of the NIGC shall approve any class III gaming ordinance or resolution described in IGRA unless the Chairman specifically determines that the ordinance or resolution was not adopted in compliance with the governing documents of the Indian tribe.  25 U.S.C. § 2710(d)(2)(B).  Upon approval of the ordinance or resolution, the Chairman shall publish in the Federal Register the ordinance or resolution and the order of approval.  25 U.S.C. § 2710(d)(2)(B).  Effective with the publication of a tribe's NIGC-approved class III gaming ordinance or resolution in the Federal Register, class III gaming activity on Indian lands of the Indian tribe shall be fully subject to the terms and conditions of the Tribal-State compact entered into pursuant to IGRA.  25 U.S.C. § 2710(d)(2)(C).

**B.    The Tribal-State Compacting Process.**

30.   An Indian tribe having jurisdiction over the Indian lands upon which class III gaming activities are being conducted, or are to be conducted, shall request the state in which such lands are located to enter into negotiations for the purpose of entering into a Tribal-State compact governing the conduct of class III gaming activities.  25 U.S.C. § 2710(d)(3)(A).  Upon receiving such a request, the state shall negotiate with the Indian tribe in good faith to enter into such a compact. 25 U.S.C. § 2710(d)(3)(A).

31.   Any Tribal-State compact negotiated pursuant to IGRA may only include provisions relating to: (1) the application of criminal and civil laws and regulations of the Indian tribe or the state that are directly related to, and necessary for, the licensing and regulation of class III gaming activity; (2) the allocation of criminal and civil jurisdiction between the state and the Indian tribe necessary for the enforcement of such laws and regulations; (3) the assessment by the state of such activities in such amounts as are necessary to defray the costs of regulating such class

III gaming activity; (4) taxation by the Indian tribe of such activity in amounts comparable to amounts assessed by the state for comparable activities; (5) remedies for breach of contract; (6) standards for the operation of class III gaming activities and maintenance of the gaming facility, including licensing; and (7) any other subjects that are directly related to the operation of class III gaming activities.  25 U.S.C. § 2710(d)(3)(C).  This list is exhaustive and all other provisions in a Tribal-State compact under IGRA are unlawful.  *See Chicken Ranch*, *supra*, 2022 WL 2978615 at *6-7, 13; *Rincon Band of Luiseno Mission Indians of Rincon Reservation v. Schwarzenegger*, 602 F.3d 1019, 1028-29 (9th Cir. 2010); *Fort Independence Indian Community v. California*, 679 F.Supp.2d 1159, 1172 (E.D. Cal. 2009); *North Fork Rancheria of Mono Indians of Cal. v. California*, 2015 WL 1148206, *9 (E.D. Cal. 2015).

32.     Except for assessments by the state of class III gaming activities in such amounts as are necessary to defray the costs of regulating the Indian tribe's gaming activity, nothing in IGRA shall be interpreted as conferring upon the state or any of its political subdivisions authority to impose any tax, fee, charge, or other assessment upon an Indian tribe or upon any other person or entity authorized by an Indian tribe to engage in class III gaming activities.  25 U.S.C. § 2710(d)(4).  No state may refuse to enter into negotiations described in IGRA based upon the lack of authority in such state, or its political subdivisions, to impose such a tax, fee, charge, or other assessment. 25 U.S.C. § 2710(d)(4).

### C.     The Secretary's Authority to Review Tribal-State Compacts.

33.     The Secretary is authorized to approve any Tribal-State compact entered into between an Indian tribe and a state governing class III gaming on the tribe's Indian lands.  25 U.S.C. § 2710(d)(8)(A).  The Secretary may disapprove a compact only if the compact violates the provisions of IGRA, any other provision of federal law that does not relate to jurisdiction over gaming on Indian lands, or the trust obligation of the United States to Indians.  25 U.S.C. § 2710(d)(8)(B).  If the Secretary does not affirmatively approve or disapprove a compact within forty-five days of its submission to the Secretary for approval, the compact is considered to have been approved by the Secretary (a "Deemed Approved" compact), but only to the extent that the compact is consistent with IGRA.  25 U.S.C. § 2710(d)(8)(C).

### D.     The Secretary's Interpretation of IGRA Under Section 2710(d)(8)(C).

34.    As contemplated by Congress, Section 2710(d)(8)(C) was an action-forcing mechanism to ensure that Tribal-State compacts would not languish before the Secretary.

35.    As implemented by the Secretary since the turn of the century, Section 2710(d)(8)(C) is used by the Secretary to "Deem Approved" Tribal-State compacts that the Secretary determines do not fully comply with IGRA.  Because Section 2710(d)(8)(C) provides that Deemed Approved compacts are only approved to the extent they are consistent with IGRA, the Secretary uses this tool to avoid disapproving a Tribal-State compact that contains unlawful provisions, so that the Indian tribe may conduct gaming.

36.    After deciding to use Section 2710(d)(8)(C), the Secretary often publishes an analysis of the Tribal-State compact provisions which the Secretary has determined violate IGRA. The Secretary's analysis is provided to the state and the Indian tribe, and published with the Tribal-State compact.  These letters are hereafter referred to as "Deemed Approved Letters."

37.    Each Deemed Approved Letter is not an exhaustive list of provisions in the Tribal-State compact that violate IGRA.  Rather, the Secretary's Deemed Approved Letters analyze parts of the Tribal-State compact while expressing general principles that should be applied broadly.

38.    The Secretary's Deemed Approved Letters explain to the state and the Indian tribe that certain provisions of the Tribal-State compact are not consistent with IGRA and are therefore not approved under Section 2710(d)(8)(C).  The Deemed Approved Letters typically contain language similar to that in the Secretary's 2013 Deemed Approved Letter regarding the Shingle Springs Tribal-State compact:

> Nothing in IGRA or its legislative history indicates that Congress intended to allow gaming compacts to be used to expand state regulatory authority over tribal activities that are not directly related to the conduct of Class III gaming.  To the extent that it is implemented in such a way, it is not lawful.  Thus, although we decline to use our authority to disapprove the Amended Compact in total, we caution the parties that, in implementing this Amended

Compact, they should avoid applying its provisions in a manner that does not directly relate to the operation of gaming activities, and thus avoid the violation of IGRA regarding the limited scope of tribal-state gaming compacts.

39.     In some instances, the Secretary's Deemed Approved Letters have narrowed how the parties to a Tribal-State compact may implement compact provisions.   In other instances, Deemed Approved Letters have expressly disapproved Tribal-State compact provisions.   For example, in the Secretary's 2012 Deemed Approved Letter regarding the Graton Rancheria Tribal-State compact:

> We have also determined that Section 12.3(a),(b) of the Compact
> attempts to regulate activities outside the scope of those prescribed
> under 25 U.S.C. § 2710(d)(3)(c), and are inconsistent with IGRA's
> requirement that class III gaming compacts regulate those activities
> which are "directly related to the operation of gaming activities"…
> we have decided to permit the Compact to take effect by operation
> of law, but only to the extent it is consistent with IGRA, and subject
> to our understanding of the actual implementation of the Compact
> described above.

40.     The Secretary also provides an analysis of the Tribal-State compact provisions that violate IGRA when the Secretary decides to disapprove a compact.   These letters are referred to herein as "Disapproval Letters."

41.     Deemed Approved Letters and Disapproval Letters are the culmination of reasoned agency action by the Secretary and are entitled to deference under the Supreme Court's *Chevron* doctrine.  *See Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984).

### E.     The Scope of the Secretary's Authority to Prescribe Gaming Procedures.

42.     An Indian tribe may initiate a cause of action against a state arising from the failure of the state to enter into negotiations with the Indian tribe for the purpose of entering into a Tribal-State compact or to conduct such negotiations in good faith.  25 U.S.C. §§ 2710(d)(7)(A)(i), (B)(i).

43.     Upon the introduction of evidence by an Indian tribe that (a) a Tribal-State compact has not been entered into and (b) the state did not respond to the request of the Indian tribe to negotiate such a compact or did not respond to such request in good faith, the burden of proof shall be upon the state to prove that the state has negotiated with the Indian tribe in good faith to conclude a Tribal-State compact governing the conduct of class III gaming activities.  25 U.S.C. § 2710(d)(7)(B)(ii).

44.     The court may take into consideration, only when making a determination whether the state carried its burden of proof that it negotiated in good faith, the public interest, public safety, criminality, financial integrity, and adverse economic impacts on existing gaming activities and shall consider any demand by the state for direct taxation of the Indian tribe or of any Indian lands as evidence that the state has not negotiated in good faith.  25 U.S.C. § 2710(d)(7)(B)(iii).  The state may not expand or exceed the permissible subjects of negotiation under 25 U.S.C. § 2710(d)(3)(C) by applying these factors.  *Chicken Ranch*, *supra*, at *13-16.

45.     If the court finds that the state failed to negotiate in good faith with the Indian tribe to conclude a Tribal-State compact governing the conduct of class III gaming activities, the court shall order the state and the Indian tribe to conclude a compact within sixty days.  25 U.S.C. § 2710(d)(7)(B)(iii).  If the state and Indian tribe fail to conclude a Tribal-State compact governing the conduct of Indian gaming activities on the Indian lands subject to the jurisdiction of the Indian tribe within the sixty-day period provided in the order of the court, the Indian tribe and the state shall submit to a mediator appointed by the court a proposed compact that represents their last best offer for a compact.  The mediator shall select from the two proposed Tribal-State compacts the one which best comports with the terms of IGRA, any other applicable federal law, and with the findings and order of the court.  25 U.S.C. § 2710(d)(7)(B)(iv).

46.     The mediator appointed by the court shall submit to the state and the Indian tribe the compact selected by the mediator.  25 U.S.C. § 2710(d)(7)(B)(v).  If the state consents to the proposed compact within sixty days, the proposed compact shall be treated as a Tribal-State compact entered into pursuant to IGRA.  25 U.S.C. § 2710(d)(7)(B)(vi).

47.     If the state refuses to consent to the mediator's selected compact, the Secretary is granted broad authority to prescribe procedures governing the Indian tribe's gaming activities ("Secretarial Procedures"). 25 U.S.C. § 2710(d)(7)(B)(vii). In practice, only a compact proposed by the Indian tribe would become the foundation for Secretarial Procedures because a state would consent to its own proposal. The Secretary's procedures must be "consistent with" (a) the Indian tribe's proposed compact, (b) IGRA, and (c) the "relevant provisions" of state law. 25 U.S.C. § 2710(d)(7)(B)(vii)(I). The Secretary must consult with the Indian tribe, but the state—having already refused to act in good faith to enter into a Tribal-State compact at least three times—is excluded from the Secretary's process. 25 U.S.C. § 2710(d)(7)(B)(vii).

48.     The Secretary is not bound by IGRA's limits on state negotiations when prescribing Secretarial Procedures. The seven subjects of negotiation under Section 2710(d)(3)(C) expressly apply only to the State's good faith negotiations. 25 U.S.C. §§ 2710(d)(3)(C) & 2710(d)(3)(A). Instead, the Secretary is guided primarily by the Indian tribe's needs and the broad purposes of IGRA. 25 U.S.C. §§ 2702(1) & (2).

### F.     Consequences of Gaming Without an Effective Tribal-State Compact.

49.     Under IGRA's criminal provisions, state laws pertaining to the licensing, regulation, or prohibition of gambling apply to class III gaming conducted in Indian country without a valid Tribal-State gaming compact. 18 U.S.C. § 1166. The United States has exclusive jurisdiction to prosecute violations of state gambling laws in Indian country. *Id.* IGRA also provides that the federal prohibition against the possession and use of gambling devices within Indian country, under 15 U.S.C. § 1175, does not apply to gaming conducted under a Tribal-State gaming compact that is in effect. 25 U.S.C. § 2710(d)(6). Thus, an Indian tribe that operates class III gaming on its Indian lands without an approved Tribal-State compact in effect is subject to federal prosecution for violation of federal and state gambling laws.

### III.    The State's Demand for Revenue Sharing Provisions in 1999 and Subsequent Compacts.

50.     In September 1999, fifty-seven California Indian tribes, including Alturas, concluded the first effective Tribal-State compacts for class III gaming in California (the "1999 Compacts"). See Cal. Gov't Code § 12012.25 (ratifying 57 compacts).

51.     The 1999 Compacts were identical in substance because the State imposed uniformity on the compacting Indian tribes.  Such an imposition was warranted at the time, because the State was under no obligation to conclude Tribal-State compacts based on then-existing State law.

52.     The 1999 Compacts were all affirmatively approved by the Secretary and published in the Federal Register on May 16, 2000, at 65 Fed. Reg. 31189.

53.     Under Section 11.2.1(a) of the 1999 Compact, Alturas is entitled to negotiate a new Tribal-State compact beginning on June 30, 2019, eighteen months before the expiration of its 1999 Compact on December 31, 2020.  *See* 1999 Compact, § 11.2.1(a), as modified by Modification No. 4.

54.     The 1999 Compacts contained provisions for two types of revenue sharing.  The Revenue Sharing Trust Fund ("RSTF") shared tribal gaming revenues with non-gaming tribes and tribes with small gaming operations.  The Special Distribution Fund ("SDF") shared tribal gaming revenues with the State, to be used by the State for defraying the costs of implementing the Tribe's compact, and other specified purposes directly related to the Indian tribe's gaming activities.

### A.     The Revenue Sharing Trust Fund:  Direct Payments to Non-Gaming Indian Tribes.

55.     In the 1990's when Alturas and other California Indian Tribes began negotiating Tribal-State compacts to govern the conduct of class III gaming on Indian lands within the State, no Las Vegas-style gambling was allowed in the State of California.  The State was under no obligation to negotiate for Tribal-State compacts under IGRA that would allow Indian tribes to offer the most attractive forms of class III gaming, slot machines and house-banked card games. *See generally In re Indian Gaming Related Cases* ("*Coyote Valley II*"), 331 F.3d 1094 (9th Cir. 2003).

56.     The State agreed to advocate for the passage of Proposition 1A in its November 1999 statewide election to amend the California Constitution and exclusively authorize Indian tribes to operate slot machines and conduct lottery games and banking and percentage card games within the State.

57.     In exchange for these substantial and meaningful concessions, Alturas and the other Indian tribes agreed to provisions in the 1999 Compacts that created the RSTF, and the tribes proposed these provisions to the State.  Under the 1999 Compacts, any revenues paid by Alturas and the other Indian tribes to the RSTF could only be used to pay each "Non-Compact Tribe" one million one hundred thousand dollars ($1,100,000) per year.  *See* 1999 Compact, § 4.3.2.1 (Record of Negotiations ("RON") Tab 70).  No other use of RSTF money was permitted.  *Id.*  The State was given "no discretion with respect to the use or disbursement of the [RSTF] trust funds."  *Id.*

58.     The RSTF was a permitted subject of negotiation because it was (a) directly related to the operation of class III gaming activities, (b) consistent with the purposes of IGRA, and (c) bargained for in exchange for a meaningful concession.  *See Coyote Valley II*, *supra*; *Rincon*, *supra*, at 1032-33.

59.     The 1999 Compact directly addresses the substantial value of the State's meaningful concessions: "The exclusive rights that Indian tribes in California, including the Tribe, will enjoy under this Compact create a unique opportunity for the Tribe to operate its Gaming Facility in an economic environment free of competition from the Class III gaming referred to in Section 4.0 of this Compact on non-Indian lands in California.  The parties are mindful that this unique environment is of great economic value to the Tribe and the fact that income from Gaming Devices represents a substantial portion of the tribes' gaming revenues."  *See* 1999 Compact, Preamble at (E) (RON Tab 70); *see also Rincon*, *supra*, at 1036 ("Just how 'meaningful' the exclusivity provision … was at the time of the 1999 compacts cannot be overstated.  In 1999, the California constitution prohibited casino-style gaming, and the State was therefore under no obligation to allow tribes to conduct it, or even negotiate concerning it.").

60.     As is the case with contracts generally, the meaningful concessions used by the State as consideration are exhausted at the end of the compact and cannot be used in future negotiations.  *Id.* at 1037 (holding that "exclusivity is not a new consideration the State can offer in negotiations because the tribe already fully enjoys that right as a matter of state constitutional law").

### B.     The Special Distribution Fund:  Compensation to the State for the Negative Externalities of Indian Gaming.

61.     The 1999 Compacts also established the SDF.  Under the 1999 Compacts, the SDF was financed out of the tribes' net win from their operation of slot machines, or "gaming devices," and SDF deposits were available for appropriation by the Legislature for the following purposes: (a) grants for programs designed to address gambling addiction; (b) grants for the support of state and local government agencies impacted by tribal government gaming; (c) compensation for regulatory costs incurred by the California Gambling Control Commission and California Department of Justice in connection with the implementation and administration of the Indian tribe's compact; (d) payment of shortfalls that may occur in the RSTF; and (e) other purposes specified by the Legislature.  *See Coyote Valley II*, *supra*, at 1105-06; 1999 Compact, §§ 5.1, 5.2 (RON Tab 70).

### C.     The Tribal Nation Grant Fund:  A New Fund Providing the State with Discretionary Control to Set Priorities for Tribal Governments.

62.     In addition to the RSTF and SDF provisions that Indian tribes offered in exchange for the 1999 Compacts, a decade later beginning with the Graton Rancheria Tribal-State compact signed in May 2012, the State established the TNGF.  Unlike the SDF and RSTF, the TNGF was not proposed by all compacting Indian tribes and was not negotiated with all compacting Indian tribes.

63.     According to the legislative analysis, the TNGF "was created… as a new destination for gaming revenue… the TNGF was created to complement the RSTF… According to the Governor's office, the TNGF reflects a vision of facilitating the development of tribal institutions and improving the quality of life of tribal people throughout the State of California." *See* Assemb. Comm. On Governmental Org., Rep. on AB 1916 (2014) (RON Tab 121).

64.     The State exercises discretionary control over the distribution of money from the TNGF to one or more non-gaming or limited-gaming Indian tribes based on competitive applications and criteria established by the State.  *See* Cal. Gov't Code §§ 12019.30 *et seq*.  Thus, unlike the RSTF, Indian tribes are subject to State control over their receipt of TNGF funds and

their use of such funds, according to the State's policies and priorities for tribal institutions and tribal people.

### IV.   The State's Pattern and Practice of Including Prohibited Provisions in Tribal-State Gaming Compacts.

65.    The State of California has engaged in a long and consistent pattern and practice of demanding that Indian tribes agree to Tribal-State compact provisions that violate IGRA.  Since the Secretary affirmatively approved the initial group of sixty-one California Tribal-State compacts in 2000, the State has submitted eighty-one more Tribal-State compacts and compact amendments to the Secretary for approval.  The Secretary affirmatively approved only twelve of them.

66.    Since 2004, the Secretary affirmatively approved only one California Tribal-State compact, in which the Indian tribe agreed not to conduct any gaming on its Indian lands, and two minor compact amendments which amended Deemed Approved compacts.  Meanwhile, the Secretary refused to affirmatively approve sixty-one California Tribal-State compacts and compact amendments and allowed them only to be Deemed Approved because their provisions violated IGRA.  As used hereafter, "compact" includes compacts and compact amendments.  The Secretary disapproved eight California Tribal-State compacts outright, including three in November 2021 and two in July 2022.

67.    Four times, the State's failure to negotiate a Tribal-State compact with an Indian tribe in good faith resulted in the issuance of Secretarial Procedures.

68.    In twenty-seven separate letters from the Secretary to the State, either disapproving Tribal-State compacts or accompanying Deemed Approved compacts, the Secretary described the numerous provisions of the Tribal-State compacts that violate IGRA, as a result of which the Secretary would not affirmatively approve the Tribal-State compacts.

69.    Between 2004 and 2020, the Secretary declined to affirmatively approve forty-two California Tribal-State compacts and compact amendments containing provisions that violate IGRA, without issuing accompanying analysis.  Twenty-one of these Tribal-State compacts were Deemed Approved in this manner between 2018 and 2020.

**A.      The Secretary Determined that California Tribal-State Compact Provisions for Environmental Regulations Not Directly Related to the Operation of Gaming Activities Are Impermissible.**

70.      Between 2008 and 2020, the Secretary refused to affirmatively approve a total of fifty-six California Tribal-State compacts and compact amendments containing environmental regulation provisions that violated IGRA.  The Secretary wrote detailed analyses of these compact provisions in letters to the State and each affected Indian tribe for nineteen of these fifty-six Deemed Approved Tribal-State compacts, explaining that the Tribal-State compacts' environmental provisions, in combination with the definitions of the terms Gaming Facility, Project, and in some cases Gaming Operations, were unlawful under IGRA.  The Secretary expressed "significant concern that the [Tribal-State compacts] allow the State to regulate areas that are not directly related to gaming."  *See*, *e.g.*, Letter from Kevin K. Washburn, Assistant Sec'y – Indian Affairs, to Nick Fonesca, Chairman, Shingle Springs Band of Miwok Indians (July 13, 2013) (RON Tab 85)*.*  Among other provisions, the Secretary stated "significant concerns about whether Section 11 [environmental regulations] of the Amended Compact… exceeds the scope of provisions tribes and states may include in a Class III gaming compact under IGRA."  *Id.*  The Secretary's concerns stemmed from the compact's overbroad definition of the terms Gaming Facility and Project.  To avoid disapproving the Tribal-State compacts, the Secretary chose to "interpret these provisions as applying only to spaces in which gaming actually takes place, to spaces in which gaming-related funds or devices are kept, to spaces in which other activities directly related to gaming occur, and to spaces occupied or frequented by employees who work within the confines of the gaming operation."  *Id.*

71.      These Deemed Approved Letters addressing overbroad definitions and unlawful environmental provisions are: **2011** Letter from Larry Echo Hawk, Assistant Sec'y – Indian Affairs, to Sherry Treppa Bridges, Chairperson, Habematolel Pomo of Upper Lake (Aug. 31, 2011) (RON Tab 93), **2012** Letters (1) from L. Echo Hawk to Leona Williams, Chairwoman, Pinoleville Pomo Nation (Feb. 9, 2012) (RON Tab 94) and (2) from Donald E. Laverdure, Acting Assistant Sec'y – Indian Affairs, to Greg Sarris, Chairman, Federated Indians of Graton Rancheria (Jul. 13, 2012) (RON Tab 84), **2013** Letter from K. Washburn to N. Fonesca, *supra*, **2014** Letters from K.

Washburn to (1) Anthony R. Pico, Chairman, Viejas Group of Capitan Grande Band of Mission Indians (Dec. 1, 2014) (RON Tab 95) and (2) Russell Attebery, Chairman, Karuk Tribe (Nov. 12, 2014) (RON Tab 96), **2015** Letters from K. Washburn to (1) Adam Dalton, Chairperson, Jackson Band of Miwok Indians (Oct. 16, 2015) (RON Tab 97), (2) Vincent P. Armenta, Chairman, Santa Ynez Band of Chumash Mission Indians (Dec. 17, 2015) (RON Tab 98), (3) Cody J. Martinez, Chairman, Sycuan Band of the Kumeyaay Nation (Dec. 17, 2015) (RON Tab 99), and (4) Gene Whitehouse, Chairman, United Auburn Indian Community (Dec. 16, 2015) (RON Tab 100), **2016** Letter from Lawrence S. Roberts, Principal Dep'y Assistant Sec'y – Indian Affairs, to Robert J. Welch, Jr., Chairman, Viejas (Baron Long) Group of Capitan Grande Band of Mission Indians (Oct. 21, 2016) (RON Tab 101), and **2017** Letters from John Tahsuda, Principal Dep'y Assistant Sec'y – Indian Affairs to (1) Chris Wright, Chairman, Dry Creek Rancheria Band of Pomo Indians (Dec. 15, 2017) (RON Tab 102), (2) Robert Martin, Chairman, Morongo Band of Mission Indians (Dec. 15, 2017) (RON Tab 103), (3) Keeny Escalanti, Sr., President, Quechan Tribe (Dec. 15, 2017) (RON Tab 104), (4) Lynn R. Valbuena, Chairwoman, San Manuel Band of Mission Indians (Dec. 15, 2017) (RON Tab 105), (5) Neil Peyron, Chairman, Tule River Indian Tribe (Dec. 15, 2017) (RON Tab 106), (6) Kevin A. Day, Chairman, Tuolumne Band of Me-Wuk Indians (Dec. 15, 2017) (RON Tab 107), (7) G. Whitehouse (Dec. 15, 2017) (RON Tab 108), and (8) Raymond C. Hitchcock, President, Wilton Rancheria (Dec. 15, 2017) (RON Tab 109)).

72.     The Secretary's analysis of the 2014 Karuk Tribe Tribal-State compact in 2014 expressly rejected the State's attempt to apply environmental regulations to "a parking lot or parking structure in which no class III gaming will be conducted." *See* Letter from K. Washburn to R. Attebery, *supra*.

73.     The Secretary's analysis of the Jackson Band Tribal-State compact in 2015 expressly rejected the State's use of the "principal purpose" test to determine whether the subject of regulation was permitted under IGRA.  The "principal purpose" test, the Secretary determined, is "broader than IGRA's requirement that compacts may regulate only those activities that are 'directly related to the operation of gaming activities.'" *See* Letter from K. Washburn to A. Dalton, *supra*.  The Secretary also disapproved the State's use of the "principal purpose" test in his

response to the 2015 Tribal-State compacts with the Santa Ynez Band, the Sycuan Band and the United Auburn Indian Community. *See* Letters from K. Washburn to V. Armenta, C. Martinez and G. Whitehouse, respectively, *supra*. The Secretary distinguished between "more general concerns that would accompany any type of development," which violate IGRA, and "unique regulatory concerns related to the operation of gaming," which are permitted by IGRA. *See also* Letter from D. Laverdure to G. Sarris, *supra* (disapproving the "but for" test).

74.    The Secretary's analysis of the 2017 Tribal-State compacts continued to narrowly interpret the environmental provisions and the definitions of Gaming Facility and Project to avoid disapproving the compacts. The Secretary stated that "these provisions must be interpreted to apply only to spaces in which gaming actually takes place, to spaces in which gaming-related funds or devices are kept, to spaces in which other activities directly related to gaming occur, and to spaces occupied or frequented by employees who work within the confines of the gaming operation." More specifically, the Secretary explained that "the provisions cannot lawfully apply to hotel rooms and hotel-related spaces… [or] businesses or amenities that are ancillary to gaming activities… To do so would violate the express provisions of IGRA that limit the scope of tribal-state gaming compacts and would, therefore, be unlawful." *See*, *e.g.*, Letter from J. Tahsuda to G. Whitehouse, *supra*.

75.    Finally, in November 2021, the Secretary disapproved three Tribal-State compacts because they contained the impermissible environmental regulations that the Secretary previously identified, and that the State continued to impose on Indian tribes. *See* Letter from Brian Newland, Assistant Sec'y – Indian Affairs, to Claudia Gonzales, Chairwoman, Picayune Rancheria of Chukchansi Indians (Nov. 5, 2021) (RON Tab 77), Letter from B. Newland to Leo Sisco, Chairman, Santa Rosa Indian Community (Nov. 23, 2021) (RON Tab 78), and Letter from B. Newland to Jose Simon III, Chairman, Middletown Rancheria of Pomo Indians (Nov. 23, 2021) (RON Tab 79). The State made nominal revisions to two of those Tribal-State compacts and resubmitted them to the Secretary for her review. The Secretary again disapproved the Tribal-State compacts, because the revised compacts imposed even broader environmental regulation on

1  the Indian tribes' gaming operations.  *See* Letter from B. Newland to L. Sisco (Jun. 22, 2022)

2  (RON Tab 73), and Letter from B. Newland to J Simon, III (Jun. 22, 2022) (RON Tab 74).

3      **B.      The Secretary Determined that California Tribal-State Compact
              Provisions that Impose Taxes, Fees, Charges or Other Assessments on
4              Indian Tribes Are Impermissible.**

5      76.      Shortly after the Ninth Circuit Court of Appeals held in *Rincon* that the State

6  violated IGRA by using a Tribal-State compact to impose a tax on the Indian tribe, the State

7  submitted on July 6, 2010, a Tribal-State compact with the Habematolel Pomo of Upper Lake to

8  the Secretary for approval.  The Secretary disapproved the compact because "the State impose[d]

9  a tax, fee, charge, or other assessment on a tribally-owned gaming facility in violation of IGRA…."

10  *S*ee Letter from L. Echo Hawk to S. Treppa (Aug. 17, 2010) (RON Tab 113).

11      77.      The Secretary disapproved the State's Tribal-State compact with the Pinoleville

12  Pomo Nation in 2011 for the same reason.  *See* Letter from L. Echo Hawk to L. Williams (Feb.

13  25, 2011) (RON Tab 114).

14      78.      In 2012, the State resubmitted a Tribal-State compact with the Pinoleville Pomo

15  Nation to the Secretary.  Again, the Secretary refused to affirmatively approve the compact because

16  it imposed taxes, fees, charges, or other assessments that violated IGRA.  After allowing the

17  compact to be Deemed Approved, the Secretary issued a letter to the State describing the

18  provisions which were not approved by operation of law.  The Secretary stated: "if the Tribe were

19  to operate more than 600 gaming devices, the effective revenue sharing rate provided for in the

20  Compact may be excessive."  The Secretary did not disapprove the compact because he found

21  "that the market in the Tribe's location is likely not conducive to the Tribe reaching the top

22  effective revenue sharing rate…."  *See* Letter from L. Echo Hawk to L. Williams (Feb. 9, 2012),

23  *supra* (RON Tab 94).

24      79.      In 2016, the State submitted a Tribal-State compact with the Viejas Band of

25  Kumeyaay Indians to the Secretary.  After allowing the compact to be Deemed Approved, the

26  Secretary issued a letter to the State describing the provisions which were not approved by

27  operation of law.  In addition to other Unlawful Compact Provisions discussed elsewhere, the

28  Secretary expressed concern "that the State is funding units of State government by including them

within the Compact without analyzing whether their inclusion or the activities they actually carry out are justified as directly related to, and necessary for, the licensing and regulation of tribal gaming." *See* Letter from L. Roberts to R. Welch, *supra* (RON Tab 101).   The Secretary also "questioned the State's methodology of allocating the tribe's regulatory costs by appropriation rather than by reference to actual costs," in part because the State was using tribal gaming funds to pay the cost of litigating whether Indian tribes could conduct class III gaming on their Indian lands.  *Id*.  The Secretary cautioned the State "that in implementing the Compact, [the State] should not apply its provisions in a manner that does not directly relate to the operation of gaming activities."  *Id*.  The Secretary described a similar concern in his response to the 2015 Tribal-State compacts with the Santa Ynez Band, the Sycuan Band and the United Auburn Indian Community wherein he stated: "We are concerned that the State is funding units of State government by including them within the Compact without analyzing whether their inclusion or the activities they actually carry out are justified as directly related to, and necessary for, the licensing and regulation of tribal gaming."  *See* Letters from K. Washburn to V. Armenta, C. Martinez and G. Whitehouse, respectively, *supra* (RON Tabs 98, 99, and 100).  *See also* Letter from K. Washburn to B. Mazzetti, Chairman, Rincon Band of Luiseno Indians (Feb. 4, 2015) (RON Tab 120) (construing similar reimbursement provision in Secretarial Procedures).

80.    In 2022, the State submitted Tribal-State compacts with the Santa Rosa Indian Community and the Middletown Rancheria to the Secretary.  In addition to other Unlawful Compact Provisions discussed elsewhere, the Secretary determined that compact provisions which require intergovernmental agreements between the Indian tribes and local governments impose unlawful taxes, fees, assessments or other charges on the tribes.  *See* Letters from B. Newland to L. Sisco and J. Simon III, respectively, *supra* (RON Tabs 73 and 74).  The Secretary noted that the Indian tribes already compensate the State for the costs of regulating the tribes' gaming activities through the SDF, and that the State failed to show "similar payments to local governments… are permissible under IGRA…."  *Id*.

### C.     The Secretary Determined that California Tribal-State Compact Provisions Regulating Food and Beverage Service and Water Quality Are Impermissible.

81.     In 2012, the State submitted a Tribal-State compact with the Federated Indians of Graton Rancheria to the Secretary for approval.   After allowing the compact to be Deemed Approved, the Secretary issued a letter to the State describing the provisions which were not approved by operation of law.   In addition to noting concerns about the overbroad environmental provisions, the Secretary also stated that "Section 12.3(a),(b) of the Compact attempts to regulate activities outside the scope of those prescribed under [IGRA]… The State's interest in regulating the Tribe's food, beverage, and drinking water services do not fall within the scope of [section 2710(d)(3)(C)(vii)], and are not within the range of state interests that Congress sought to protect when it enacted IGRA."   *See* Letter from D. Laverdure to G. Sarris, *supra* (RON Tab 84).

### D.     The Secretary Determined that California Tribal-State Compact Provisions Requiring Intergovernmental Agreements with Local Governments Are Impermissible.

82.     In 2021, the State submitted substantially identical Tribal-State compacts with the Picayune Rancheria of Chukchansi Indians, the Santa Rosa Indian Community, and the Middletown Rancheria of Pomo Indians to the Secretary for approval.   The Secretary described the long history of objections to the State's imposition of Unlawful Compact Provisions in class III gaming activities on Indian lands, and disapproved all three compacts.   *See* Letters from B. Newland to C. Gonzales, L. Sisco, and J. Simon III, respectively, *supra* (RON Tabs 77, 78, and 79).

83.     As part of the environmental review process prescribed in the Santa Rosa compact, the compact required Santa Rosa to enter into agreements with the State's local governments to provide mitigation for each tribal Project.   The compact prohibited Santa Rosa from constructing or renovating a Gaming Facility before agreement with the local government, or binding arbitration with the local government, was completed.   The Secretary disapproved the requirement for an intergovernmental agreement, stating: "the requirement to enter into an intergovernmental agreement prior to commencement or construction of a project provides local governments an effective veto over an on-reservation Tribal project.   Therefore, these provisions, as written, fall

outside of the narrow range of topics IGRA permits in a compact and must be disapproved." *See* Letter from B. Newland to L. Sisco, *supra* (RON Tab 78); *see also* Letter from K. Washburn to N. Fonesca, *supra* (RON Tab 85), Letter from L. Echo Hawk to S. Treppa Bridges, *supra* (RON Tab 93), Letter from B. Newland to C. Gonzales, *supra* (RON Tab 77), and Letter from B. Newland to J. Simon III, *supra* (RON Tab 79).

84.     In 2022, the State submitted substantially identical Tribal-State compacts with the Santa Rosa Indian Community and the Middletown Rancheria to the Secretary for approval.  In addition to reiterating the Secretary's 2021 disapproval, the Secretary further stated that the compact provisions for intergovernmental agreements between the Indian tribes and local governments "reflects a delegation from the State to the County and the City for immediate oversite of the Tribe's compliance with Section 11… the provisions requiring the intergovernmental agreement with local governments is beyond the narrow range of topics IGRA permits in a compact." *See* Letter from B. Newland to L. Sisco, *supra* (RON Tab 73).

85.     The Secretary's draft regulations, published March 28, 2022, further emphasize that "[a]ll compacts, amendments, agreements, or other documents – including, but not limited to, any dispute resolutions, settlement agreements, or arbitration decisions – which establish, change, or interpret the terms and conditions for the operation and regulation of a Tribe's class III gaming activities… must be submitted for review and approval by the Secretary." *See* Consultation Draft, Part 293—Class III Tribal-State Compact (Mar. 28, 2022) (RON Tab 122, proposed 25 C.F.R. § 293.4(a)).

### E.     The Secretary Determined that California Tribal-State Compact Provisions Regulating Tribal Liability for Torts Not Directly Related to the Operation of Gaming Activities Are Impermissible.

86.     The disapproved Tribal-State compacts of the Picayune, Middletown, and Santa Rosa Rancherias each contained provisions that required the Indian tribe to adopt a tort claims ordinance covering tort claims "arising out of, connected with, or relating to the operation of the Gaming Operation, the Gaming Facility, or the Gaming Activity."  As a result of this expansive language and the provision's incorporation of broadly-defined terms, each of the Secretary's 2021 Disapproval Letters stated, "We are highly concerned with the State requiring the Tribe to adopt a

tort claim ordinance that could be interpreted to apply to more than just activity directly related to gaming." *See* Letters from B. Newland to C. Gonzales, L. Sisco, and J. Simon III, respectively, *supra* (RON Tabs 77, 78, and 79).

### F.   California's Disregard of the Secretary's Determinations that the State's Compacts Violate IGRA.

87.   Since no later than 2008, the Secretary has consistently, repeatedly, and increasingly objected to unlawfully expansive provisions in California's Tribal-State compacts.

88.   The Secretary disapproved, severed or narrowly interpreted Unlawful Compact Provisions based on the Secretary's interpretations of IGRA.   Specifically, the Secretary determined that:

(a)   The State's definitions for Gaming Facility, Gaming Operation, and Project are impermissibly broad and include subjects that are not directly related to class III gaming activity.

(b)   The State's use of those definitions in the environmental provisions of its Tribal-State compacts exceeds the permissible subjects of negotiation under IGRA.

(c)   The State's use of a "but for" or "principal purpose" test is not permitted under IGRA, which requires that the permissible subjects of negotiation be directly related to the operation of class III gaming activities.

(d)   The State's demand to regulate areas of a Gaming Facility outside of where gaming actually takes place, gaming-related funds or devices are kept, or other activities directly related to gaming occur, is not a permissible subject of negotiation under IGRA.

(e)   The State's demand that a tribe share revenues from its gaming activities exceeding the amounts necessary to defray the State's costs of regulating the tribe's class III gaming activities is an impermissible tax, fee, or other assessment that violates IGRA.

(f)   The State's calculation of the cost of regulating a tribe's class III gaming activities based on legislative appropriations instead of the "actual costs, necessary and directly related to regulating gaming" is an impermissible tax, fee, or other assessment that violates IGRA.

(g)     The State's demand to regulate food and beverage service is not a permissible subject of negotiation under IGRA.

(h)     The State's demand to regulate water quality is not a permissible subject of negotiation under IGRA.

(i)     The State's demand that tribes enter into agreements with local governments as a condition prior to conducting class III gaming, thereby enabling local governments to impose unspecified and unreviewed conditions on such gaming, is not a permissible subject of negotiation under IGRA.

(j)     The State's demand to regulate tribal liability for torts that are not directly related to the operation of gaming activities is not a permissible subject of negotiation under IGRA.

89.     The Secretary also addressed the issues identified in the preceding paragraph, among others, in a "technical assistance" letter dated April 30, 2020. *See* Letter from Paula L. Hart, Dir., Off. of Indian Gaming, to Lester J. Marston (Apr. 30, 2020) (RON Tab 90).

90.     On March 24, 2022, Governor Newsom signed revised Tribal-State compacts with Santa Rosa Indian Community and Middletown Rancheria of Pomo Indians.  These revised compacts are substantially the same as the compacts the Secretary disapproved in 2021. *See* Tribal-State Compact Between the State of California and the Middletown Rancheria of Pomo Indians (executed Mar. 24, 2022) (RON Tab 71); Tribal-State Compact Between the State of California and the Santa Rosa Indian Community (executed Mar. 24, 2022) (RON Tab 72).  The Secretary found that the State's revisions "reflect[] wordsmithing and the removal of superfluous provisions… [but] key provisions I identified in the 2021 Disapproval as problematic remain unchanged." *See* Letter from B. Newland to L. Sisco, *supra*.

### G.     The Secretary's Interpretation of IGRA is Entitled to *Chevron* Deference.

91.     Congress has charged the Secretary with the administration of Indian affairs generally, 25 U.S.C. §§ 2, 9, and the review of Tribal-State compacts under IGRA in particular, *id.* § 2710(d)(8).

92.     Exercising that authority, the Secretary reviews Tribal-State compacts for violations of IGRA, 25 U.S.C. § 2710(d)(8)(B)(i), including whether the compact includes provisions relating to matters beyond the scope of negotiable subjects as set forth in 25 U.S.C. § 2710(d)(3)(C).

93.     Section 2710(d)(3)(C) contains standards which Congress did not precisely define, including the phrase "directly related."  25 U.S.C. § 2710(d)(3)(C)(i) ("directly related to, and necessary for, the licensing and regulation of such [class III gaming] activity"); *id.* § 2710(d)(3)(C)(vii) ("other subjects that are directly related to the operation of gaming activities"). Congress did not define, for instance, how attenuated the relationship between the subject of the compact and the operation of gaming activities may be while remaining direct.  The Secretary therefore construes these statutory terms in light of Congress's intent based on the purposes of IGRA, its legislative history, and other considerations, when making a decision to approve or disapprove a Tribal-State compact, or to disapprove or limit certain compact provisions in a Deemed Approved Letter.

94.     Under IGRA, the Secretary's decisions carry the force of law, as Secretarial approval is needed to permit class III gaming activities.  The Secretary's interpretation of IGRA's Tribal-State compact provisions is a key part of a comprehensive and detailed regulatory scheme. The Secretary's decisions and interpretation are made public to inform other interested parties about the accepted interpretation of IGRA's provisions, and they carry precedential value for subsequent Secretarial decisions.

95.     On March 28, 2022, the Secretary issued a Consultation Draft of proposed revisions to 25 C.F.R. Part 293 governing the class III gaming compact process under IGRA.  *See* Consultation Draft (RON Tab 122).  The Department's draft regulations reflect its prior consistent statements about the Unlawful Compact Provisions.  Among other revisions, the Department's draft regulations:

(a)     Define "gaming activities" to mean the conduct of class III gaming involving the three required elements of chance, consideration, and prize.

(b)     Define "gaming facility" to mean the space within a building where the gaming activity occurs and the spaces necessary for conduct of gaming.

(c)     Provide that every document which establishes, changes, or interprets the terms and conditions for the operation and regulation of a Tribe's class III gaming activities must be submitted to the Department for approval as a class III gaming compact or compact amendment.

(d)     Require that a State must show the actual expenses for regulating a specific Tribe's gaming activity when demanding payments to defray the cost of regulating class III gaming activities.

(e)     State that all provisions of a compact or compact amendment must be directly related to the operation of gaming activities.  The State and the Tribe must show a direct connection between the subject regulated and the Tribe's conduct of class III gaming activities.

96.     Once adopted, the Secretary's regulations will also be due deference by the Court. Until then, the Court should consider the draft regulations as persuasive evidence that the Secretary intended to, and did, establish a comprehensive regulatory scheme that applied broadly to all Indian tribes through the systematic publication of Deemed Approved Letters and Disapproval Letters.

97.     The Secretary's reasonable interpretation of IGRA in Disapproval Letters and Deemed Approved Letters is entitled to *Chevron* deference in court, and the Secretary's reasonable interpretation also necessarily sets the governing standard for the State's good faith negotiation of a Tribal-State compact.   The State's negotiations that disregard the Secretary's reasonable interpretation of IGRA are not conducted in good faith.

### H.     The State is Bound by the Secretary's Decisions and Determinations of Issues Necessarily Decided in those Decisions.

98.     The Secretary's Disapproval Letters and Deemed Approved Letters are each the product of a regular, robust and fair adjudicatory decision-making process governed substantively by IGRA, with opportunities for the State to litigate its views before the Secretary, and ultimately

the opportunity for the State to commence an action for judicial review of the Secretary's decision under the Administrative Procedure Act.  5 U.S.C. § 702.

99.     To date, the State has not sought judicial review of any Disapproval Letter or Deemed Approved Letter.  The six-year statute of limitations for seeking such review has expired with respect to many of the decisions.  Each Disapproval Letter and Deemed Approved Letter for a California Tribal-State compact is a valid final judgment of whether such compact violates IGRA, or provisions of such compact are inconsistent with IGRA.

100.     The Secretary's determinations in Disapproval Letters and Deemed Approved Letters regarding the permissible subject matter of a Tribal-State compact are essential to the Secretary's decision to disapprove a compact because it violates IGRA, or to allow it to be Deemed Approved except to the extent it is inconsistent with IGRA.

101.     The State is precluded from relitigating any such issue decided by the Secretary in a Disapproval Letter or Deemed Approved Letter.

102.     The State's negotiations that disregard the Secretary's final decisions and the determination of issues necessarily decided therein are not conducted in good faith.

**V.     The Governor's Obligation to Negotiate and Submit to the State Legislature a Tribal-State Compact that is Materially Identical to the Model Compact.**

103.     IGRA does not provide the Governor any authority to act on behalf of the State in the Tribal-State compacting process.  Any authority vested in the Governor to act on behalf of the State must arise under state law.  *See Stand Up for California! v. California*, 64 Cal.App.5th 197, 202 (2021) (citing *United Auburn Indian Community of Auburn Rancheria v. Newsom*, 10 Cal.5th 538 (2020)).

104.     By approving Proposition 1A (1999) the people of California amended the California Constitution to authorize the Governor to "negotiate and conclude compacts, subject to ratification by the Legislature… in accordance with federal law."  Cal. Const., Art. IV, § 19(f).

**A.     The Governor's Negotiations for a Model Compact in 1999.**

105.     Following the passage of Proposition 1A in 1999 the Governor exercised his authority to negotiate and conclude Tribal-State compacts, and negotiated and concluded a "Model Compact" that was ultimately executed in identical form by more than 60 Indian tribes.

106.    After the Governor's initial execution of the Model Compacts, the State Legislature ratified the first 57 Tribal-State compacts in one action.  Cal. Gov't Code § 12012.25(a), Ch. 874, Stats. of 1999.  Those 57 Tribal-State compacts were materially identical.

107.    Having approved the substance and form of the Model Compact, the State Legislature further provided that any subsequent Tribal-State compact that "is identical in all material respects" to the Model Compact is deemed to be ratified by the State Legislature.  Cal. Gov't Code § 12012.25(b).  This provision is consistent with the California Constitution because the Governor already exercised his authority to negotiate and conclude the Model Compact.

108.    The State Legislature ratified the Governor's 1999 Model Compact as an approved Model Compact for all Indian tribes, subject to further review by the Legislature but not further re-negotiation by the Governor.  *Id.* §§ 12012.25(e) (providing for negotiations under subsection (b)), 12012.25(d) (providing that the statute denies the Governor some authority to negotiate) & 12012.25(b) (providing no authority for the Governor to re-negotiate material provisions of the Model Compact that were previously negotiated by the Governor and ratified by the State Legislature).

**B.    State Law Prescribes Procedures for Entering Into a Ratified Tribal-State Compact.**

109.    IGRA contemplates that the State will negotiate and enter into a Tribal-State compact with an Indian tribe.  The provisions of IGRA and principles of federalism leave room for the State to prescribe the procedures for the State and an Indian tribe to enter into a Tribal-State compact.  The State Legislature provided explicit procedures for an Indian tribe to enter into a Tribal-State compact ratified by the Legislature in accordance with the State Constitution.  An Indian tribe may request a ratified Tribal-State compact under either Sections 12012.25(b) or 12012.25(c) of the California Government Code.

110.    If an Indian tribe requests the State to enter into a Tribal-State compact that is materially identical to the 1999 Model Compact under subsection (b), the Governor may negotiate only non-material provisions of the compact.  The Governor has no authority to re-negotiate the material provisions of the Model Compact.  The Governor is required to submit the executed Model Compact to the State Legislature.  *Id.* §§ 12012.25(b), (e).  If the State Legislature does not

reject the Model Compact by a two-thirds vote (supermajority) of each house, it is ratified by operation of the statute. *Id.* §§ 12012.25(b) & (b)(2).

111. Alternatively, an Indian tribe may request negotiations with the Governor for a materially different Tribal-State compact under subsection (c). The State Legislature "acknowledge[d] the right of federally recognized Indian tribes to exercise their sovereignty to negotiate and enter into tribal-state gaming compacts that are materially different from the [Model Compact]." *Id.* § 12012.25(c). Consistent with subsection (b), the Legislature did not acknowledge any right of the Governor to request that an Indian tribe negotiate Tribal-State compact provisions that are materially different from the Model Compact. Only if desired by an Indian tribe in the exercise of its sovereignty, Section 12012.25(c) contemplates negotiations between the State and the Indian tribe which result in a materially different compact. *Id.* § 12012.25(e).

112. Nothing in State law prevents an Indian tribe from initially requesting negotiations for a materially different Tribal-State compact under subsection (c), and then withdrawing from such negotiations with the Governor and requesting negotiation of a Model Compact under subsection (b).

113. The State has chosen to fulfill its duty under IGRA to enter into a Tribal-State compact by (1) establishing a Model Compact, (2) entitling Indian tribes to the Model Compact, and (3) authorizing Indian tribes to negotiate provisions that differ from the Model Compact. An Indian tribe is entitled to have the Governor negotiate the Model Compact and submit it to the State Legislature for review without re-negotiation of material provisions.

### VI. Compact Negotiations Between Alturas and the State.

#### A. Chronology of Compact Negotiations.

114. On May 7, 2020, by letter to the State, Alturas requested that the State negotiate a Tribal-State gaming compact. *See* Letter from Phillip Del Rosa, Chairman, Alturas, to Gavin Newsom, Governor, State of California (May 7, 2020) (RON Tab 1).

115. The State did not respond until October 5, 2020. *See* Letter from Anna Naimark, Tribal Negots. Advisor, to P. Del Rosa (Oct. 5, 2020) (RON Tab 2).

116.     On October 28, 2020, by email the State provided Alturas with exemplar copies of the Tribal-State compacts for the Yurok Tribe and Hoopa Valley Tribe, suggesting that they could serve as templates for Alturas's replacement Tribal-State compact.  *See* E-mail from A. Naimark to John M. Peebles, Att'y, Alturas (Oct. 28, 2020, 5:59 p.m.) (RON Tab 13); Tribal-State Compact Between the State of California and the Hoopa Valley Tribe (RON Tab 14); Tribal-State Compact Between the Yurok Tribe and the State of California (RON Tab 15); *see also* E-mail from Nathan Voegeli, Interim Tribal Negots. Advisor, to J. Peebles (Oct. 27, 2021, 12:15 p.m.) (RON Tab 21).

117.     On March 31, 2021, the United States District Court for the Eastern District of California issued a decision holding that the State did not negotiate in good faith with several Indian tribes as required by IGRA "by raising topics in negotiations that were beyond the scope permitted by IGRA or which required some form of meaningful concession in return."  *Chicken Ranch Rancheria of Me-Wuk Indians v. Newsom*, 530 F.Supp.3d 970, 987-88 (E.D. Cal. 2021) (RON Tab 76).

118.     During the spring and summer of 2021, the State completed negotiating Tribal-State compacts with other Indian tribes, including the compacts for the Picayune Rancheria of Chukchansi Indians, Santa Rosa Indian Community, and Middletown Rancheria.  (RON Tabs 110, 111, 112).  The State Legislature ratified these Tribal-State compacts and they were submitted to the Secretary for approval.

119.     On August 31, 2021, by letter the State notified Alturas that it had appointed an Interim Tribal Negotiations Advisor, Nathan Voegeli.  *See* Letter from N. Voegeli to J. Peebles (Aug. 31, 2021) (RON Tab 17).

120.     On October 7, 2021, the Secretary sent a letter to Governor Newsom regarding the Picayune Rancheria Tribal-State compact that had been submitted for the Secretary's review.  *See* Letter from Paula L. Hart, Dir., Off. of Indian Gaming, to G. Newsom (Oct. 7, 2021) (RON Tab 91).  The Secretary asked the State to explain how several provisions in the Picayune Rancheria Tribal-State compact were permissible subjects of negotiation under IGRA, and how they were directly related to gaming.  The provisions of concern included terms relating to tobacco sales, tort claims, environmental regulation, and labor relations.  The Secretary also asked for justifications

regarding several aspects of the Picayune Rancheria Tribal-State compact's revenue sharing provisions, including the Special Distribution Fund, the Revenue Sharing Trust Fund, the Tribal Nation Grant Fund, and an explanation of how obligations and incentives to make payments to local governments comply with IGRA.  The Secretary sent letters to the Governor on or about October 27, 2021, expressing similar concerns about the Santa Rosa Indian Community and Middletown Rancheria Tribal-State compacts.

121.   On October 22, 2021, Alturas renewed its request for a Tribal-State compact negotiation meeting.  *See* Letter from J. Peebles to N. Voegeli (Oct. 22, 2021) (RON Tab 19).

122.   Responding by email to Alturas on October 27, 2021, the State suggested that Alturas use the Middletown Rancheria Tribal-State compact as a template for the Alturas compact. The State advised that it desired to learn Alturas's "preferred economic terms and its desired approach regarding the environmental review process in the compact."  The State also emphasized the "limited time" available, stating that "[t]o allow sufficient time for legislative and DOI review, it will be important to have a signed compact to the Legislature in January 2022."  The State further provided that the Tribe should "focus primarily on adjustments [to the State's compact negotiated with another Indian tribe] key to the Tribe's concerns."  Email from N. Voegeli to J. Peebles (Oct. 27, 2021, 12:15 p.m.) (RON Tab 21).

123.   On October 29, 2021, the State responded by letter to the Secretary's October 7, 2021, request for additional justification regarding the Picayune Rancheria Tribal-State compact. *See* Letter from N. Voegeli to P. Hart (Oct. 29, 2021) (RON Tab 92).  The State's response included, essentially, the same statements it has made to Alturas in the course of compact negotiations.  The State declared, *inter alia*:

(a)   Because the compact included "a significant increase in the number of authorized Gaming Devices and Gaming Facilities, an extended term, increased revenue sharing to Non-Gaming and Limited-Gaming tribes, a recognition of the Tribe's existing relationship with local government, an entitlement to renegotiate based on changed conditions, and a more robust dispute resolution process in the case of an alleged material

breach" the subjects of negotiation in the compact were not "so attenuated from gameplay" that they were prohibited under 25 U.S.C. § 2710(d)(3)(C)(vii).

(b)    Because federal law prohibits tobacco sales to anyone under 21 years of age, the State may broadly include such provisions in the compact.

(c)    Because "the principal purpose test, rather than an incidental benefit, is consistent … with IGRA provisions that limit the subjects of negotiation to those which are directly related to gaming," the compact definitions for Gaming Operation and Gaming Facility are "'directly related' includ[ing] consideration of, among other things, the primary purpose of an activity."

(d)    Because "[w]ithout the operation of gaming activities, there would be no patrons and no incidents giving rise to tort claims [and] without patrons, no Gaming Activities would occur," and because the tribe was required to adopt the tort laws as a tribal ordinance, such laws are "respectful of the Tribal-State government-to-government relationship and the Tribe's role in establishing appropriate legal standards governing activities within the Tribe's jurisdiction."

(e)    Because "[c]ompensation for negative externalities caused by gaming is a subject directly related to gaming," and because the tribe was required to adopt the environmental laws as a tribal ordinance, the environmental review process in the compact, including the required intergovernmental agreements, is a permissible subject of negotiation.

124.   On November 5, 2021, having considered the State's October 29, 2021, justifications, the Secretary formally disapproved the Picayune Rancheria class III gaming compact. *See* Letter from B. Newland to C. Gonzales, *supra* (RON Tab 77). Similar disapprovals of the Santa Rosa Indian Community and Middletown Rancheria compacts followed on or about November 23, 2021. *See* Letters from B. Newland to L. Sisco and J. Simon III, *supra* (RON Tabs 78 and 79, respectively). In each Disapproval Letter, the Secretary set forth an interpretation of IGRA consistent with previous Secretarial decisions explaining how and why IGRA limits the subjects over which states and tribes may negotiate a Tribal-State compact, and provided specific

objections to provisions of the Tribal-State compacts that violate IGRA. In each Disapproval Letter, the Secretary disapproved the compact "as a violation of IGRA because it contains terms that are outside of the narrow scope of IGRA approved topics and are not 'directly related to the operation of Class III gaming activities.'"

125. The Disapproval Letters, *inter alia*, set forth the Secretary's interpretation of IGRA's "catch-all" category of Section 2710(d)(3)(c)(vii), "subjects that are directly related to the operation of gaming activities." The Disapproval Letters disapproved the "but for" test for the relationship between the subject of a compact provision and the operation of class III gaming activities, and the equivalent "principal purpose" test imposed by the State in the disapproved Tribal-State compacts.

126. Alturas and the State held a compact negotiation session by videoconference on November 19, 2021. On or around that date, the State suggested that Alturas use the Tribal-State compact for Sherwood Valley Rancheria of Pomo Indians as a template on which to base the Alturas compact.

127. On November 23, 2021, by email the State provided Alturas with a copy of the Sherwood Valley compact and requested that Alturas "redline" the compact "as appropriate for the Alturas Indian Rancheria." *See* E-mail from N. Voegeli to J. Peebles (Nov. 23, 2021, 12:22 p.m.) (RON Tab 27). The Sherwood Valley compact was executed by the Governor on August 10, 2021, but had not been ratified by the State legislature. *See* Tribal-State Compact Between the State of California and the Sherwood Valley Rancheria of Pomo Indians of California (RON Tab 28). Its provisions are substantially similar to the Picayune Rancheria compact that was disapproved by the Secretary seven days prior to the State's request that the Tribe accept the Sherwood Valley compact as a template.

128. On November 29, 2021, by email the State pressured Alturas to send proposed revisions to its Sherwood Valley Tribal-State compact. *See* E-mail from N. Voegeli to J. Peebles (Nov. 29, 2021, 10:15 a.m.) (RON Tab 30).

129. On December 6, 2021, the State, by letter to Assistant Secretary – Indian Affairs Brian Newland, requested that the Secretary reconsider the decision to disapprove the Picayune

Rancheria compact on the grounds that (1) the disapproval was "contrary to the Secretary's approach in numerous prior and currently operative compacts," (2) the decision "disrupts years of complex and carefully considered negotiations," and (3) the State and the Tribe should be entitled to "determine their own best interests in negotiating a compact." See Letter from N. Voegeli to B. Newland (Dec. 6, 2021) (RON Tab 80).

130.    On December 13, 2021, by email the State again pressured Alturas to send proposed revisions to its Sherwood Valley Tribal-State compact. *See* E-mail from N. Voegeli to J. Peebles (Dec. 13, 2021, 12:38 p.m.) (RON Tab 32).  Alturas replied by email of the same date that it was still considering revisions required by the *Chicken Ranch* decision, given the Ninth Circuit Court of Appeals hearing on December 9, 2021.  *See* E-mail from J. Peebles to N. Voegeli (Dec. 13, 2021, 12:43) (RON Tab 33).

131.    On December 22, 2021, by email the State again pressured Alturas to send proposed revisions to its Sherwood Valley Tribal-State compact.  *See* E-mail from N. Voegeli to J. Peebles (Dec. 22, 2021, 8:35 a.m.) (RON Tab 42).

132.    In response, by email the same day Alturas provided to the State a draft Tribal-State compact based on the Sherwood Valley compact with substantial revisions that Alturas expressed were needed to ensure that the provisions of the compact comply with the permissible subjects of negotiation under the IGRA. *See* E-mail from J. Peebles to N. Voegeli (Dec. 22, 2021, 9:53 a.m.) (RON Tab 44); Tribal-State Compact Between the State of California and the Alturas Indian Rancheria, California (Alturas draft, Dec. 22, 2021) (RON Tab 45).  Alturas's proposed revisions directly addressed issues raised by ongoing bad faith litigation by other Indian tribes, including *Chicken Ranch*, the Disapproval Letters, and guidance provided by the Secretary on April 30, 2020.

133.    The State and Tribe held a compact negotiation session on December 30, 2021. During the meeting and in subsequent correspondence on January 4, 2022, the State informed the Tribe it did not plan to accept any terms or revisions proposed by Alturas that addressed the reasons the Secretary disapproved similar Tribal-State gaming compacts.  *See* E-mail from N. Voegeli to J. Peebles (Jan. 4, 2022, 12:45 p.m.) (RON Tab 47).  Instead, the State would focus on provisions

"peripheral" to the issues raised in the Disapproval Letters, and that it would reserve the right to address issues arising from the Disapproval Letters "when appropriate." Rather than negotiate the disapproved provisions, the State "would not plan to incorporate but can note changes that appear to result from the uncertainty created by the recent compact disapprovals…."

134.    On January 18, 2022, by email the State sent Alturas a draft Tribal-State compact based on the Sherwood Valley compact.  *See* E-mail from N. Voegeli to J. Peebles (Jan. 18, 2022, 5:45 p.m.) (RON Tab 50); Tribal-State Compact Between the State of California and the Alturas Indian Rancheria, California (State draft, Jan. 18, 2022) (RON Tab 51).  The State's draft compact incorporated mostly insubstantial revisions proposed by the Tribe.  With respect to the provisions proposed by Alturas that, in the State's view, represented a "broader response" to the Disapproval Letters, the State repeatedly stated there was "no response required at this time."  Accordingly, the State told Alturas that it would only respond to Tribal negotiations that did not, in the State's view, "result[] from the recent compact disapprovals by the U.S. Department of the Interior."

135.    The State refused to remove terms from the Tribal-State compact that are impermissible subjects of negotiation under IGRA.

136.    The State also refused to negotiate edits to the environmental provisions in Section 11 with Alturas, despite the State having committed on December 30, 2022, to provide edits to Section 11 that would address the impermissible subject of negotiation identified in the Secretary's Disapproval Letters.  Instead, the State redirected Alturas to substantially similar environmental provisions from its Tribal-State compact with the Shingle Springs Rancheria in 2008.  The 2008 Shingle Springs compact was not affirmatively approved by the Secretary.

137.    The State further demanded the ability to control Alturas' sovereign judicial processes.  The State demanded that the Tribe provide every person appearing before its court with "an opportunity for a hearing," which the State itself does not grant to every litigant, and rejected the Tribe's carefully crafted due process provisions.  The State dictated the composition of the Tribe's Claims Commission, as well as the terms for the selection and discipline of Commissioners.

138.    On January 26, 2022, by letter Alturas informed the State of the Tribe's concern that the State was unwilling to negotiate a replacement compact for Alturas that could obtain the Secretary's approval, and in particular the State's unwillingness to address issues identified by the Secretary regarding the limits that IGRA imposes on compact provisions, or to apply the principles underlying the Secretary's Disapproval Letters in negotiations with the Tribe.  *See* Letter from Patrick R. Bergin, Att'y, Alturas, to N. Voegeli (Jan. 26, 2022) (RON Tab 53).  Alturas also expressed concerns about the State's imposition of environmental review provisions, including provisions disapproved by the Secretary and similar provisions that appeared in Tribal-State compacts that were Deemed Approved, but for which the Secretary had narrowed their interpretation.  Alturas also voiced its disagreement with the State's insistence on terms that would impose State control on the Tribe's judicial system, as well as provisions that attempted to regulate matters not directly related to the operation of class III gaming activities, under the guise of overbroad licensing requirements.  Alturas requested that the State provide substantive responses to the Tribe's proposed Tribal-State compact in light of currently applicable law, including the Secretary's directives found in the 2021 Disapproval Letters.

139.    On February 17, 2022, the State responded by letter to Alturas' January 16, 2022, concerns.  *See* Letter from N. Voegeli to P. Bergin (Feb. 17, 2022) (RON Tab 54).  The State declared that the Disapproval Letters were narrowly focused and that "the issues would appear to be resolvable through a relatively narrow set of changes to the environmental review process, tobacco, and other specific provisions."  The State further declared that the Secretary's directives do not affect, broadly, "licensing, regulating gaming, or defraying State costs for such regulation through payments to the Special Distribution Fund."

140.    The State further declared that the Deemed Approved Letters that identify compact provisions that violate IGRA were merely "informative."  The State echoed its prior proposal of continuing negotiations by "only noting those broader provisions that appeared to be an apparent response by the Tribe to [the Secretary's] compact disapprovals so that the provisions can be addressed later."

141.    The State also declared that it intended to regulate Alturas's sovereign adjudicatory processes based on the State's "significant interest in... provisions accounting for the public interest, public safety, and the fair play of gaming."  The State erroneously declared that IGRA authorizes the State to regulate the Tribe in the public interest and for general public safety.

142.    The State further erroneously declared that IGRA authorizes it to negotiate broadly for "regulation and licensing of the Tribe's gaming operation and gaming facility" under 25 U.S.C. §§ 2710(d)(3)(C)(i)-(vii).

143.    Finally, in numerous places in its February 17, 2022, letter to Alturas, the State invited the Tribe to "further clarify or refine" the State's draft compact and "suggest other edits for the State's consideration."  The State's invitation followed its repeated refusal to consider previous edits suggested by Alturas for the same provisions.

144.    The State did not offer any revisions that would enable Alturas to conclude a Tribal-State compact that could be affirmatively approved by the Secretary.

145.    On July 22, 2022, the Secretary disapproved Tribal-State compacts executed between the State and the Santa Rosa Indian Community and the Middletown Rancheria.  *See* Letters from B. Newland to L. Sisco and J. Simon, III (RON Tabs 73 and 74).  The Secretary determined that the State had refused to revise or eliminate Unlawful Compact Provisions that were identified in the Secretary's November 2021 Disapproval Letters.  The Secretary expressly notified the State that her disapproval included all Unlawful Compact Provisions which had been discussed in prior Deemed Approved Letters to the State, and not only those provisions specifically identified in the 2021 and 2022 Disapproval Letters.

146.    On July 28, 2022, by letter to the State, Alturas requested an extension of its 1999 Compact for a period of 20 years ending in 2043.  *See* Letter from J. Peebles to N. Voegeli (July 28, 2022) (RON Tab 69).  Alturas described the Unlawful Compact Provisions, more fully stated below, and its determination that the State's unyielding demand to impose those Unlawful Compact Provisions on Alturas wholly prevented the State and Alturas from executing a Tribal-State compact that could be approved by the Secretary.  Because a simple Tribal-State compact

extension is not subject to Secretarial approval (25 C.F.R. § 293.5), Alturas' proposed 20-year extension would ensure that it had an effective compact.

147.   In the alternative, Alturas requested the State enter into a new Tribal-State compact that is materially identical to its 1999 Compact pursuant to the requirements of California Government Code § 12012.25(b).

148.   On July 28, 2022, the United States Court of Appeals for the Ninth Circuit issued its decision in the State's appeal of *Chicken Ranch*. 2022 WL 2978615. The Ninth Circuit *affirmed* that the State had failed to negotiate in good faith. More specifically, the court held that "[w]hether considered separately or as a collective whole [the provisions] are not directly related to the operation of gaming activities." *Id*. at *11. The provisions separately identified by the Ninth Circuit as unlawful, and that the State demanded Alturas agree to, include:

(a)   Requiring Alturas adopt a tribal law ordinance incorporating "significant aspects of California's Environmental Quality Act (CEQA) and the National Environmental Policy Act (NEPA)." *Id*. at *10.

(b)   Prohibiting Alturas from commencing "any construction on any Project until the required environmental processes and associated dispute resolution procedures were completed." *Id*.

(c)   Requiring Alturas to "prepare Tribal Environmental Impact Documents or Tribal Environmental Impact Reports [that] address the impacts of a Project on (i) air quality; (ii) water resources; (iii) traffic; (iv) public services; (v) hazardous materials; and (vi) noise." *Id*.

(d)   Requiring Alturas to "consent to elaborate reporting requirements, as well as dispute resolution mechanisms for any disputes that arose between tribes and State and local governments." *Id*.

(e)   Requiring Alturas to enter "intergovernmental agreements with local governments before commencing any Project." *Id*. And requiring Alturas to "agree to binding arbitration with local governments concerning intergovernmental agreements." *Id*.

(f)     Requiring Alturas to "follow California tort law for all claims of bodily injury, personal injury, or property damage directly arising out of, connected with, or relating to the operation of the Gaming Operation, Gaming Facility, or the Gaming Activities, including but not limited to injuries resulting from entry onto the Tribe's land for purposes of patronizing the Gaming Facility or providing goods or services to the Gaming Facility, provided that such injury occurs at the Gaming Facility or on a road accessing the Facility exclusively." *Id*.

(g)     Requiring Alturas to waive its sovereign immunity "for tort claims in tribal court and, if the tribe lacks a tribal court system, to create a tribal claims commission to resolve covered claims." *Id*. at *11.

(h)     Requiring Alturas to "employ in tribal courts and claims commissions discovery procedures analogous to those found in the California Code of Civil Procedure." *Id*.

149.    The Ninth Circuit further explained that not only were such provisions not directly related to the operation of gaming activities, the State is prohibited from including such provisions in a Tribal-State compact under any conditions – with or without an offer of meaningful concessions – because the list of subjects at 25 U.S.C. § 2710(d)(3)(C) is exhaustive. *Id*. at *12-13. Moreover, the Ninth Circuit added, all these provisions "strike at core aspects of tribal sovereignty concerning the tribes' governance over their land and people and their decisions about how to structure entire areas of tribal law," and IGRA does not authorize states to include such provisions in Tribal-State compacts. *Id*. at *11.

150.    On August 5, 2022, by letter the State unilaterally informed Alturas that it would suspend compact negotiations. The State declared that it would "reach out to the Tribe after the State's 45-day review to reschedule the negotiation meeting." *See* Letter from N. Voegeli to J. Peebles (Aug. 5, 2022) (RON Tab 124).

151.    On August 12, 2022, by letter the State informed Alturas that it was "not able to accept the Tribe's proposal to extend its 1999 compact or execute a materially identical compact at this time…." *See* Letter from N. Voegeli to J. Peebles (Aug. 12, 2022) (RON Tab 126).

### B.   Unlawful Compact Provisions the State Seeks to Impose on Alturas – Regulatory Provisions.

152.    For more than twenty years, Alturas has successfully operated the Desert Rose Casino on the Alturas Indian Rancheria under the negotiated regulations in its 1999 Compact which span 36 pages.  Despite that success, the State now seeks to impose a compact on Alturas that spans 120 pages and includes numerous new provisions that exceed the subjects and scope of negotiations permitted by IGRA.

153.    The State ignored the Secretary's consistent direction and warnings that its Tribal-State compacts included subjects of negotiation that are not permitted under IGRA.  The State imposed the same impermissible subjects of negotiation on Alturas in each of its Tribal-State compact drafts.

154.    On December 22, 2021, as requested by the State, Alturas provided to the State a draft Tribal-State compact based on the Sherwood Valley compact with substantial revisions that Alturas expressed were needed to ensure that the compact complies with IGRA.  Alturas's proposed revisions directly addressed issues raised in ongoing bad faith litigation by other Indian tribes, the District Court's decision in *Chicken Ranch*, Congress's intent in enacting IGRA, and the direction provided by the Secretary in Disapproval Letters and Deemed Approved Letters.

155.    The State proposed compact templates to Alturas on October 28, 2020; October 27, 2021; and November 23, 2021; and provided a draft Tribal-State compact to Alturas on January 18, 2022.  In each template and draft and throughout the compact negotiations, the State has ignored the decisions of the Secretary and rejected most of Alturas's substantive revisions.  By demanding compact provisions the Secretary had previously disapproved, either expressly or by logical extension of the Secretary's express analysis upon which those rejections were based, the State attempted to impose Unlawful Compact Provisions on Alturas.

156.    Consistent with the State's pattern and practice of imposing non-negotiable compact provisions on Indian tribes, the State has refused to negotiate core provisions of the Tribal-State compact with Alturas.  The State has refused at all times to accept Alturas's revisions to remove Unlawful Compact Provisions that would bring the Tribal-State compact into

compliance with IGRA, federal court decisions, and the Secretary's reasoned interpretation of IGRA.

157.    The State demanded the following Unlawful Compact Provisions:

(a)    The State demanded compact provisions containing and relying on overbroad definitions of the terms Gaming Employees, Gaming Facility, Gaming Operation and Project.  These definitions and other provisions use the "but for," "principal purpose," and other similar tests.  The State's definition of "Gaming Employee" includes "any natural person who is an employee of the Gaming Operation and … is in any way responsible for supervising [any] Gaming Activities or persons who conduct, operate, maintain, repair, account for, assist, or supervise any such Gaming Activities … or … whose employment duties require or authorize access to areas of the Gaming Facility in which any activities related to Gaming Activities are conducted but that are not open to the public."  The State's definition of "Gaming Operation" includes the entire "business enterprise that offers and operates Gaming Activities" that are not "unrelated to the operation of the Gaming Facility."  The State's definition of "Gaming Facility" includes "any building in which Gaming Activities or any Gaming Operations occur, or in which the business records, receipts, or other funds of the Gaming Operation are maintained … which may include parking lots, walkways, rooms, buildings, and areas that provide amenities to Gaming Activity patrons, if and only if, a principal purpose of which is to serve the activities of the Gaming Operation…."  The State's definition of "Project" includes "(i) the construction of a new Gaming Facility; (ii) a renovation, expansion or modification of an existing Gaming Facility; or (iii) other activity involving a physical change to the reservation environment, provided the principal purpose of which is directly related to the activities of the Gaming Operation, and any one of which may cause a Significant Effect on the Off-Reservation Environment."  Compact provisions which incorporate the defined terms regulate subjects that are not directly related to the operation of class III gaming activities.  Such provisions exceed the permissible scope of a Tribal-State gaming compact under Section 2710(d)(3)(C).

(b)     The State demanded environmental provisions that exceed the permissible scope of a Tribal-State compact under Section 2710(d)(3)(C).  These provisions apply the State's impermissibly overbroad definitions.  They require Alturas to conduct extensive environmental review for the construction or modification of facilities where no class III gaming occurs, as a mandatory condition for Alturas to conduct class III gaming operations.  IGRA does not authorize State regulation of the environmental impacts of an Indian tribe's projects on its Indian lands that are not directly related to the tribe's operation of class III gaming activities.

(c)     The State demanded compact provisions that would prohibit Alturas's commencement of a Project until it executes intergovernmental agreements with the County of Modoc, a political subdivision of the State, and the California Department of Transportation (Caltrans), an administrative agency of the State government, to address matters such as energy consumption, traffic, public safety, and aesthetic impacts to the community character.  These provisions also permit the County of Modoc and Caltrans to use binding arbitration to compel Alturas to enter into such agreements and to enforce Alturas's compliance with them, and the compact provisions prohibit Alturas's commencement of a Project until any such dispute is resolved.   These provisions incorporate the State's overbroad definition of Project.  They also incorporate mandatory conditions to be imposed upon Alturas's ability to conduct class III gaming which are not defined in the Tribal-State compact, will not be the product of negotiations between Alturas and the State, and will evade the Secretary's review.

(d)     The State demanded compact provisions regarding the licensing of Alturas employees in excess of the permissible scope of a Tribal-State compact under Section 2710(d)(3)(C).  These provisions incorporate the State's overbroad definition of Gaming Employee.  Under IGRA, Alturas's gaming ordinance is required to provide an adequate system for issuing licenses for "primary management officials and key employees of the gaming enterprise" in compliance with federal regulations.  25 U.S.C. § 2710(b)(2)(F); 25 C.F.R. Part 558.  Under Section 2710(d)(3)(C)(vi), Alturas and the State may negotiate

"standards for the operation of [class III gaming] activity … including licensing."  IGRA does not authorize Tribal-State compacts to include provisions that enlarge the scope of employees subject to licensing under IGRA beyond those who engage in the operation of class III gaming activity.

(e)     The State demanded compact provisions that require Alturas, with respect to all Gaming Operation and Gaming Facility employees, to adopt State anti-discrimination, anti-harassment, and anti-retaliation employment laws, and waive its sovereign immunity in connection therewith; adopt minimum wage, hour, and overtime laws specified by the State; adhere to the State's workers compensation standards; comply with the State's unemployment and disability insurance laws and waive its sovereign immunity in connection therewith; and adopt a labor relations ordinance for employee organization and representation.  Federal laws other than IGRA govern Alturas in some or all of these areas.  These compact provisions incorporate the State's impermissibly overbroad definitions.  Under Section 2710(d)(3)(C)(i), Alturas and the State may negotiate provisions relating to the application of the civil laws and regulations of the State that are "directly related to, and necessary for, the licensing and regulation of [class III gaming] activity."  These compact provisions exceed the permissible scope of a Tribal-State gaming compact under Section 2710(d)(3)(C).

(f)     The State demanded compact provisions that require Alturas to "adopt and comply with standards no less stringent than California public health standards for food and beverage handling" and "allow inspection of food and beverage services by state or county health inspectors."  The handling of food and beverages is not a subject that is directly related to the operation of gaming activities, and the regulation thereof is not a standard for the operation of gaming activity.  These compact provisions exceed the permissible scope of a Tribal-State gaming compact under Section 2710(d)(3)(C).

(g)     The State demanded compact provisions that require Alturas to "adopt and comply with standards no less stringent than federal water quality and safe drinking water standards applicable in California," and "allow for inspection and testing of water quality

by state or county health inspectors." The quality of drinking water is not a subject that is directly related to the operation of gaming activities, and the regulation thereof is not a standard for the operation of gaming activity. These compact provisions exceed the permissible scope of a Tribal-State gaming compact under Section 2710(d)(3)(C).

(h)    The State demanded compact provisions that require Alturas to adopt standards set by the State governing Alturas's tort liability for personal injuries and property damage "directly arising out of, connected with, or relating to the operation of the Gaming Operation, Gaming Facility, or Gaming Activities." These provisions incorporate the State's impermissibly overbroad definitions. These compact provisions exceed the permissible scope of a Tribal-State compact under Section 2710(d)(3)(C).

(i)    The State demanded control over Alturas's adjudicatory processes. First, the State demanded that Alturas grant formal trial-like hearings to all persons bringing a dispute before its Tribal Court. Neither federal law nor state law require such procedures. Second, if Alturas elected to adjudicate disputes through a Claims Commission, the State attempted to prescribe the size of the Claims Commission, qualifications for Commissioners, and terms for removal of Commissioners. These compact provisions intrude deeply into the sovereign governmental functions of the Tribe, dictate the manner in which the Tribe conducts its adjudications, and exceed the permissible scope of a Tribal-State compact under Section 2710(d)(3)(C).

### C.    Unlawful Compact Provisions the State Seeks to Impose on Alturas – Taxes, Fees, Charges or Other Assessments.

158.    The State has attempted to impose the following taxes, fees, charges, or other assessments upon Alturas:

(a)    Payments into the SDF in excess of the amounts necessary to defray the State's costs of regulating Alturas's class III gaming activity.

(b)    Payments to local governments in unspecified amounts pursuant to subsequent intergovernmental agreements.

(c)    A penalty charge on any late payments into the SDF.

159.     The State has sought to impose these taxes, fees, charges, or other assessments on Alturas, and has never wavered from its demands for such Unlawful Compact Provisions that are not permitted by IGRA.  Alturas has proposed revisions to the Tribal-State compact draft to remove these unlawful taxes, fees, charges, or other assessments.  The State has refused to accept Alturas's proposed revisions.  The State has sought to impose these taxes, fees, charges, or other assessments as a condition of entering into a Tribal-State compact with Alturas.

160.     The compact provisions concerning the SDF currently demanded by the State are significantly different from the SDF provisions in the 1999 Compacts.  Under the SDF provisions the State now demands, the amount of each Tribe's payment is based on that Tribe's share of the total number of gaming devices operated by Indian tribes in California, multiplied by the State's annual budget appropriation to fund the State's administration of all Tribal-State compacts and Secretarial Procedures in California, and its Office of Problem Gambling.  The list of State agencies that may be funded with tribal gaming revenues has grown from two agencies to nine.

161.     As applied in Tribal-State compacts the State has negotiated with other Indian tribes, and as provided in the terms the State has demanded to include in Alturas' compact, the State would have discretion to deposit those Indian tribes' revenue sharing payments into the RSTF or TNGF.  Provided the RSTF were fully funded, the State could deposit all of the Indian tribes' revenue sharing payments into the State's discretionary TNGF fund.  The State could also transfer money from the RSTF into the TNGF.  And the State could transfer money from the SDF to the RSTF if the account has insufficient funds.

162.     The State's demands for SDF revenue sharing are completely unrelated to assessments necessary to defray the costs of regulating Alturas's class III gaming activity.  The State's authority to transfer some or all of the funds between the SDF, RSTF, and TNGF would establish fully-fungible accounts that functionally would operate as a single general fund for the State to allocate tribal gaming revenues to State and tribal governments with substantial discretion—limited primarily by the requirement that it pay $1.1 million to each limited-gaming and non-gaming Indian tribe each year.

163.    The Secretary has repeatedly explained to the State that its method of calculating an Indian tribe's SDF contributions "by appropriation rather than by reference to actual costs" includes State expenditures that are not directly related to the Indian tribe's class III gaming.  Letter from L. Roberts to R. Welch, Jr., *supra*, at n. 20 (RON Tab 101).  *See also* Letter from K. Washburn to B. Mazzetti, *supra* (RON Tab 120); Letter from K. Washburn to V. Armenta, *supra*, at n. 18 (RON Tab 98).

164.    In 2007, the California State Auditor published a report (No. 2006-036) addressing the State's uses of SDF funds arising from Tribal-State compacts which concluded that "not every project funded under one of [the statutorily mandated] purposes was linked to an impact from a casino."  (RON Tab 115).  The State Auditor further found that, out of thirty grants made with SDF Funds, at least five expended money for purposes that did not offset the adverse effects of Indian casinos, and an additional ten primarily addressed needs that were unrelated to Indian gaming.  The State Auditor also found that local governments were maintaining large accounts with payments from Indian gaming, and reallocating the interest on those accounts for general fund purposes in violation of IGRA.  The State's misuse of funds from Indian gaming affected one-half of the discretionary grants of SDF funds that were reviewed by the State Auditor.

165.    In 2011, the California State Auditor published another report (No. 2010-036) regarding the State's use of SDF funds.  (RON Tab 116).  The State Auditor again found that for one-half of the of the grants reviewed, "the grant recipient either could not provide evidence of, or could not quantify, the impact of the casino."  The State Auditor therefore found that the grantee could not prove that Indian gaming funds were used "in proportion to the impact of the casino, as required by law."  In at least one case, a grant of funds from the SDF was awarded to an ineligible entity.

166.    In 2015, the California Gambling Control Commission ("CGCC") reported to the California Joint Legislative Budget Committee that it was continuing to use SDF funds for purposes not directly related to an Indian tribe's class III gaming activities.  "Report on the Use of Funds from the Indian Gaming Special Distribution Fund," Cal. Gambling Control Comm., Item 0855-111-0367 (Apr. 1, 2015) (RON Tab 117).  For example, the CGCC used SDF funds to pay

for the State's lawsuits brought by Indian tribes to enforce IGRA, its costs for negotiating new Tribal-State compacts, its costs for releasing public records under State law, and its advice to state and local agencies. *Id*. at pp. 14-15. Further, the CGCC's report stated that the California Department of Justice does not record how SDF funds were spent on programs it administers. *Id*. at pp. 15, 18.

167. The total annual RSTF distribution of $1.1 million each to non-gaming and limited-gaming Indian tribes, amounts to approximately $96.5 million.

168. Since the release of the State Auditor's report in 2011, the State's annual transfer from the SDF to the California Gambling Control Commission for such grants has decreased from approximately $9 million to approximately $3 million. *See* Cal. State Budget 2021-22, Item 0855, Cal. Gambling Control Comm'n (RON Tab 118). There is no evidence the State repaid the misused SDF funds.

169. As of the 2021-22 State budget, annual discretionary grant funds available from the TNGF total approximately $50 million. *See id*.

**VII. Extension of the 1999 Compact.**

170. Section 11.2.1(a) of the 1999 Compact (as modified by Modification No. 4) provides that if the parties have not agreed to extend the 1999 Compact or enter into a new Tribal-State compact by the expiration date of December 31, 2020, then the 1999 Compact is automatically extended to June 30, 2022. *See* 1999 Compact (RON Tab 70). Alturas's 1999 Compact was automatically extended under this provision.

171. On January 26, 2022, the State sent letters to the Indian tribes with which it was conducting gaming compact negotiations, including Alturas, stating that the State was willing, upon written request by the Tribe, to amend the 1999 Compact solely to extend its termination date by one year, to June 30, 2023, on the basis of "uncertainty" created by the 2021 Disapproval Letters. Such amendment would require ratification by the California Legislature, according to the State. *See* Letter from N. Voegeli to P. Del Rosa (Jan. 26, 2022) (RON Tab 52).

172. On April 13, 2022, after the State had agreed to extend the 1999 Compacts of other Indian tribes for 18 months, until December 31, 2023, the State offered Alturas the same non-

negotiable extension.  *See* Letter from N. Voegeli to P. Del Rosa (Apr. 13, 2022) (RON Tab 56). With the impending expiration of its 1999 Compact, Alturas agreed to the extension.  *See* Letter from J. Peebles to N. Voegeli (Apr. 20, 2022) (RON Tab 58).  The amendment extending the 1999 Compact was ratified by the California Legislature on May 31, 2022, and took effect upon its publication in the Federal Register on June 30, 2022.  *See* Indian Gaming: Extension of Tribal-State Class III Gaming Compacts in California, 87 Fed. Reg. 39115 (June 30, 2022).

173.    On July 28, 2022, by letter to the State, Alturas requested the State execute a 20-year extension of its 1999 Compact.  *See* Letter from J. Peebles to N. Voegeli (July 28, 2022) (RON Tab 69).  Alturas requested such extension because of its success in operating under the 1999 Compact, Alturas's unique circumstances, the State's continued demands for unlawful provisions, and the State's recent demonstration that extending the 1999 Compact did not require Secretarial approval.

174.    In the same letter, Alturas alternatively requested that the State negotiate a Tribal-State compact that is materially identical to its 1999 Compact under Government Code Section 12012.25(b).  Alturas informed the State that if the State continued to demand Unlawful Compact Provisions, Alturas would withdraw its request to negotiate materially different compact provisions under Government Code Section 12012.25(c).

175.    On August 12, 2022, by letter the State rejected Alturas's request for a materially identical Model Compact pursuant to Government Code Section 12012.25(b).  *See* Letter from N. Voegeli to J. Peebles (Aug. 12, 2022) (RON Tab 126).

**VIII.    The State's Conduct Harms Alturas.**

176.    As a result of the State's conduct described herein, the State and Alturas have not entered into a new Tribal-State compact under 25 U.S.C. § 2710(d)(3).

177.    The State's conduct has denied Alturas its statutory right under IGRA to engage in negotiations conducted by the State in good faith for a Tribal-State compact, in violation of the State's statutory duty to Alturas.

178.    The State's conduct impairs Alturas's right under IGRA to operate class III gaming on its Indian lands, harms its ability to develop a new facility for class III gaming, harms its ability

to renovate or expand its existing facility for class III gaming, and infringes upon its inherent right to engage in activities on its Indian lands that are not directly related to gaming without State interference.

179.    Absent the requested relief, Alturas will be unable to enter into a new Tribal-State compact that can be approved by the Secretary prior to the expiration of Alturas's 1999 Compact, and Alturas will be compelled to cease gaming at that time or be subject to federal prosecution for violating California and federal gambling laws.

180.    As a result of the State's conduct, Alturas faces the loss of gaming revenues which are essential to the effective operation of the Tribal government, infringing upon Alturas's right to self-governance and diminishing its capacity for self-sufficiency.

## **FIRST CLAIM FOR RELIEF**

### **Failure to Negotiate in Good Faith in Violation of 25 U.S.C. § 2710(d)(3):  The State's Demands for Unlawful Compact Provisions**

181.    Alturas incorporates by reference and realleges herein the allegations contained in the foregoing paragraphs of this Complaint.

182.    In 25 U.S.C. § 2710(d)(3)(C)(i)-(vii), Congress set forth an exhaustive list of the subjects to which the provisions of a Tribal-State compact may relate.

183.    IGRA's requirement that the State negotiate in good faith requires the State to adhere to the interpretation of IGRA in the Secretary's Disapproval Letters, Deemed Approved Letters, and guidance letters, when the State engages in negotiations for a Tribal-State compact. Alturas's Tribal-State compact must conform to the Secretary's interpretation of IGRA because the compact cannot become effective without the Secretary's approval, whether by affirmative approval or allowing the compact to be Deemed Approved, under 25 U.S.C. §§ 2710(d)(3)(B) and 2710(d)(8).

184.    IGRA's requirement that the State negotiate in good faith also requires the State, in Tribal-State compact negotiations, to adhere to decisions from the federal courts, such as in *Chicken Ranch*, to the extent such decisions interpret whether compact provisions demanded or proposed by the State are permitted in a lawful Tribal-State compact.

185.    The State has demanded Unlawful Compact Provisions and provisions that exceed the limited scope of State regulation permitted under IGRA.   The State's demand for these Unlawful Compact Provisions violates IGRA.

186.    The State has ignored repeated and consistent direction from the Secretary that only matters directly related to the operation of class III gaming activities may be regulated by a Tribal-State gaming compact.   As described in the Secretary's Disapproval Letters, all of the gaming compacts the State has proposed as drafts or templates for negotiation improperly substituted "but for" and "principal purpose" tests for the "directly related" criterion that Congress expressly provided in 25 U.S.C. § 2710(d)(3)(C)(vii).   The State's proposed provisions to regulate matters that are not directly related to the operation of class III gaming activities are unlawful under 25 U.S.C. § 2710(d)(3)(C).

187.    The Ninth Circuit found that the State's demands for environmental law and tort provisions violate the State's duty to negotiate in good faith under IGRA.   *Chicken Ranch*, *supra*, 2022 WL 2978615.   More specifically, the court determined that none of these subjects the State demanded to negotiate were directly related to the operation of gaming activities.   *Id*. at *11.

188.    By insisting that Alturas agree to the Unlawful Compact Provisions, and provisions that exceed the permissible scope of a Tribal-State compact, the State has failed to negotiate with Alturas in good faith to enter into a Tribal-State compact, in violation of Section 2710(d)(3).

## SECOND CLAIM FOR RELIEF

**Failure to Negotiate in Good Faith in Violation of 25 U.S.C. §§ 2710(d)(3) and 2710(d)(4): The State's Demands for Revenue Sharing and Attempts to Impose a Prohibited Tax, Fee, Charge, or Other Assessment upon Alturas**

189.    Alturas incorporates by reference and realleges herein the allegations contained in the foregoing paragraphs of this Complaint.

190.    In 25 U.S.C. § 2710(d)(4), Congress specifically prohibited a State and its political subdivisions from imposing any tax, fee, charge, or other assessment upon an Indian tribe or any other person or entity authorized by an Indian tribe to engage in class III gaming activity, except for assessments necessary to defray the State's costs of regulating the tribe's class III gaming activity that may be agreed to in a Tribal-State compact under Section 2710(d)(3)(C)(iii).   Section

2710(d)(4) further provides that the State must not refuse to negotiate a class III gaming Tribal-State compact based upon such lack of authority to impose a tax, fee, charge, or other assessment.

191.    The State demanded that Alturas make payments that are not necessary to defray the State's costs of regulating Alturas's class III gaming activity.  Such payments constitute a tax, fee, charge, or other assessment under 25 U.S.C. § 2710(d)(4).

192.    Under 25 U.S.C. § 2710(d)(7)(B)(iii)(II), the Court "shall consider any demand by the State for direct taxation of the Indian tribe or of any Indian lands as evidence that the State has not negotiated in good faith."

193.    The State has not offered concessions that are meaningful to Alturas as consideration for such payments.

194.    The State's failure to offer meaningful concessions as consideration for its payment demands is further evidence that the State seeks not to negotiate, but rather to impose, a tax, fee, charge, or other assessment upon Alturas in violation of 25 U.S.C. § 2710(d)(4).

195.    The State's failure to offer meaningful concessions as consideration for its payment demands is further evidence that the State has not negotiated in good faith.

196.    The State's attempt to impose these taxes, fees, charges, or other assessments is a failure to negotiate with Alturas in good faith, in violation of 25 U.S.C. § 2710(d)(3).

### **THIRD CLAIM FOR RELIEF**

**Failure to Negotiate in Good Faith in Violation of 25 U.S.C. § 2710(d)(3):  The State's Demand for Tribal-State Compact Provisions that Require Alturas to Enter into Separate Intergovernmental Agreements**

197.    Alturas incorporates by reference and realleges herein the allegations contained in the foregoing paragraphs of this Complaint.

198.    The State's demand that Alturas execute and comply with subsequent intergovernmental agreements with the County of Modoc and with Caltrans containing additional terms not specified in the Tribal-State compact as a mandatory condition of Alturas's operation of class III gaming on its Indian lands violates IGRA's requirement that the Tribal-State compact be negotiated between the Tribe and the State.

199.     The State's demand that Alturas execute and comply with subsequent intergovernmental agreements with the County of Modoc and with Caltrans as a mandatory condition of Alturas's operation of class III gaming on its Indian lands circumvents IGRA's requirement that each compact and compact amendment be reviewed by the Secretary, and prevents the Secretary from ensuring that the provisions of such future agreements do not violate IGRA, federal law, or the Secretary's trust responsibility.

200.     The State's demand that Alturas execute and comply with subsequent intergovernmental agreements with the County of Modoc and with Caltrans would impose additional undefined conditions upon Alturas's ability to engage in activities that are not directly related to its operation of class III gaming, exceeding the permissible scope of a Tribal-State compact.

201.     The State's demands for compact provisions that would require Alturas to enter into separate agreements with entities other than the State as a condition of engaging in gaming activities, and without Secretarial approval of such agreements, and in excess of the permissible scope of a Tribal-State compact, constitutes a failure to conduct negotiations with Alturas in good faith, in violation of 25 U.S.C. § 2710(d)(3).

### FOURTH CLAIM FOR RELIEF

### Failure to Negotiate in Good Faith in Violation of 25 U.S.C. § 2710(d)(3):  The State's Demand for Control over the Tribe's Adjudications.

202.     Alturas incorporates by reference and realleges herein the allegations contained in the foregoing paragraphs of this Complaint.

203.     The State attempted to control the manner in which Alturas adjudicates alleged violations of Alturas's tribal law—matters arising under the Tribe's patron dispute, labor claims, and tort claims ordinances.

204.     The State demanded to hijack Alturas's sovereign right to establish its own system of courts (which includes, for purposes of this Complaint, the Tribal Claims Commission referenced in the draft compacts), including the formation of such courts and the procedures by

which such courts may act, by imposing procedural requirements on Alturas's courts that are unnecessary to meet applicable due process standards.

205.    These demands to impose State control over Alturas's adjudication of its own laws is inconsistent with the purposes of IGRA.  *See Chicken Ranch*, *supra*, 2022 WL 2978615 at *11.

206.    These demands also exceed the permissible subjects of negotiation under IGRA. The provisions demanded by the State do not relate to the "application" of Tribal or State laws that are directly related to, and necessary for, the licensing and regulation of class III gaming activity. 25 U.S.C. § 2710(d)(3)(C)(i).  These provisions do not relate to the "allocation," between the State and the Tribe, of jurisdiction necessary for the enforcement of such laws.  *Id.* § 2710(d)(3)(C)(ii). These provisions are not related to any other subject directly related to the operation of gaming activities.  *Id.* § 2710(d)(3)(C)(vii).

207.    The State's demands for provisions to control Alturas's adjudication of patron disputes, employee claims, and tort claims constitutes a failure to negotiate in good faith.

### FIFTH CLAIM FOR RELIEF

### Failure to Negotiate in Good Faith in Violation of 25 U.S.C. § 2710(d)(3):  The State's Sham or Surface Bargaining.

208.    Alturas incorporates by reference and realleges herein the allegations contained in the foregoing paragraphs of this Complaint.

209.    Bargaining provisions of the National Labor Relations Act ("NLRA") provide guidance for evaluating the State's good faith conduct in negotiating a Tribal-State compact.  *See In re Indian Gaming Related Cases*, 147 F.Supp.2d 1011, 1020-1021 (N.D. Cal. 2001); *see also Fort Independence Indian Cmty. v. California*, 679 F.Supp.2d 1159, 1187 (E.D. Cal. 2009) (describing surface bargaining) and *Pauma Band of Mission Indians v. California*, 973 F.3d 953, 962 & n. 1 (9th Cir. 2020) (describing surface bargaining).

210.    The State's attitude of "take-it or leave-it," or going through the motions of negotiating with any real intent to reach an agreement is surface bargaining.  *See NLRB v. Ins. Agents Int'l Union*, 361 U.S. 477, 485 (1960); *K-Mart Corp. v. NLRB*, 626 F.2d 704, 706 (9th Cir. 1980).

211.     The State's offering of "[p]atently improbable justifications for [its] bargaining position" is surface bargaining.  *See NLRB v. Mar-Len Cabinets, Inc.*, 659 F.2d 995, 1000 (9th Cir. 1981).

212.     The State's failure to present counterproposals to the fundamental issues of concern in the Tribal-State compact is surface bargaining.  *See NLRB v. Maywood Do-Nut Co., Inc.*, 659 F.2d 108, 109 (9th Cir. 1981).

213.     The State's "unilateral action" in imposing terms the State negotiated with another Indian tribe on Alturas is surface bargaining.  *See Seattle-First Nat'l Bank v. NLRB*, 638 F.2d 1221, 1227 (9th Cir. 1981).

214.     The State's knowledge that the "entire spectrum of proposals put forward… is so consistently and predictably unpalatable" to Alturas that agreement would be impossible is surface bargaining.  *See NLRB v. Mar-Len Cabinets*, 659 F.2d at 999.

215.     Even where provisions demanded by the State are potentially lawful, the State's surface bargaining is a failure to negotiate in good faith in violation of IGRA.  *See Chicken Ranch*, *supra*, at *15 ("The [good faith] factors require analysis when a state seeks to negotiation *within* the seven topics, but when the specific nature of the state's request is such that an inference of bad faith still arises….").

### SIXTH CLAIM FOR RELIEF

### Failure to Negotiate and Submit a Materially Identical Tribal-State Compact in Violation of Cal. Gov't Code § 12012.25.

216.     Alturas incorporates by reference and realleges herein the allegations contained in the foregoing paragraphs of this Complaint.

217.     Under California Government Code section 12012.25, Alturas is entitled to negotiate and enter into a Tribal-State compact that is identical in all material respects to the Model Compact.  When Alturas requests to negotiate such a compact, the Governor lacks authority to re-negotiate material provisions.  Instead, following any negotiation of non-material provisions, the Governor shall submit a copy of the executed compact to the Legislature, which then has the

opportunity to reject the compact by a supermajority vote of both houses or allow it to be ratified by operation of law.

218.    The State refused to enter into negotiations with Alturas for the purpose of entering into a Tribal-State compact that is materially identical to the Model Compact, and refused to conduct such negotiations in good faith.

219.    The Governor refused to negotiate a Tribal-State compact that is materially identical to the Model Compact and submit it to the State Legislature.

220.    The Governor's refusal to negotiate a Tribal-State compact that is materially identical to the Model Compact and submit such compact to the State Legislature violates State law.  Cal. Gov. Code § 12012.25.

## SEVENTH CLAIM FOR RELIEF

### Failure to Negotiate in Good Faith in Violation of 25 U.S.C. § 2710(d)(3):  The State's Refusal to Enter Into a Materially Identical Tribal-State Compact.

221.    Alturas incorporates by reference and realleges herein the allegations contained in the foregoing paragraphs of this Complaint.

222.    Alturas is entitled by State law to enter into a Tribal-State compact that is materially identical to its 1999 Compact.

223.    The Governor refused to negotiate and submit to the State Legislature a Tribal-State compact that is materially identical to the 1999 Compacts in violation of State law.  Cal. Gov't Code § 12012.25.

224.    The State's refusal to enter into a Tribal-State compact as required by State law is a failure to negotiate in good faith in violation of IGRA.

## REQUEST FOR RELIEF

WHEREFORE, pursuant to its claims and causes of action alleged herein, Alturas prays for judgment as follows:

225.    Declaring that the State failed to conduct negotiations with Alturas in good faith for the purpose of entering into a Tribal-State compact in violation of 25 U.S.C. § 2710(d)(3)(A);

226.    Declaring that each of the Unlawful Compact Provisions described herein exceed the permissible scope of a Tribal-State compact under 25 U.S.C. § 2710(d)(3)(C), and the State's demands for such provisions violated its duty under IGRA to conduct Tribal-State compact negotiations in good faith:

    a.  Definitions of the terms Gaming Employees, Gaming Facility, Gaming Operation, and Project;

    b.  Environmental review and mitigation provisions;

    c.  Mandatory intergovernmental agreements;

    d.  Employee licensing requirements;

    e.  Employment regulations;

    f.  Regulation of food and beverage handling;

    g.  Regulation of water quality; and

    h.  Liability for personal injuries and property damage;

227.    Declaring that the State, by demanding the revenue sharing provisions described herein, attempted to impose an unlawful tax, fee, charge, or other assessment upon Alturas, in violation of its duty under IGRA to conduct Tribal-State compact negotiations in good faith:

    a.  SDF payments in excess of the amounts necessary to defray the State's costs of regulating Alturas's class III gaming activity;

    b.  Penalty charges for late SDF payments.

    c.  Provisions enabling Alturas's SDF payments to be transferred into the RSTF.

    d.  Provisions enabling funds thus deposited into the RSTF to be transferred to the TNGF.

    e.  Payments to local governments in unspecified amounts pursuant to subsequent intergovernmental agreements.

228.    Declaring that IGRA does not authorize Tribal-State compact provisions that require Alturas to enter into separate intergovernmental agreements with entities other than the State as a condition of engaging in gaming activities, absent Secretarial approval of a compact amendment, and in excess of the permissible scope of a Tribal-State compact, and the State's

demand for such provisions violated the State's duty under IGRA to conduct negotiations in good faith;

229. Declaring that the Governor violated California Government Code § 12012.25 by refusing to negotiate and submit to the State Legislature a Tribal-State compact that is materially identical to the Model Compact.

230. Declaring that by the Governor's violation of California Government Code § 12012.25, the State violated its duty under IGRA to conduct compact negotiations in good faith;

231. Ordering the State to resume negotiations with Alturas for a Tribal-State compact and to conclude a compact within 60 days of the date of the Court's order, pursuant to 25 U.S.C. § 2710(d)(7)(B)(iii), and thereafter to follow the process prescribed by IGRA if the State and Alturas fail to conclude a Tribal-State compact within that period;

232. Awarding costs, fees and expenses to Alturas; and

233. Granting such other and further relief as the Court may deem just and proper.

Respectfully submitted this 22nd day of August, 2022,

John M. Peebles
Patrick R. Bergin
Michael A. Robinson
Tim Hennessy
Steven J. Bloxham
Curtis Vandermolen
PEEBLES KIDDER BERGIN & ROBINSON LLP
2020 L Street, Suite 250
Sacramento, California 95811
Telephone:  (916) 441-2700
Fax:  (916) 441-2067
Email:  jpeebles@ndnlaw.com


By: *s/ John M. Peebles*
         John M. Peebles
         Attorneys for Plaintiff